Syllabus.

## JOHN KEENAN

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa September 25, 1882.*

NEW TRIAL—*in criminal case—to admit newly discovered evidence.* On the trial of one for murder, the only evidence connecting the accused with the crime, which was committed in the city of Chicago, was the testimony of a saloon keeper of that city, who testified to facts and circumstances pointing very strongly toward his guilt or participation in the homicide, no witness seeing the murder or identifying the party who committed the act. The prisoner denied all the material facts in this witness' testimony, and testified to being absent in the country on the night of the murder, when the saloon keeper said he was in his place of business, about ten or twelve o'clock, the accused stating that early in the morning after the murder took place he boarded a freight train going into the city, as it was moving slowly, and concealed himself in a car, the contents of which he described, to some extent. In this he was in some measure corroborated by other witnesses as to the facts and circumstances detailed by him, and as to the contents of one of the cars on that morning train, thus presenting a question to the jury as to whose story and version were true, or entitled to belief. To rebut the prisoner's statement, witnesses were called who testified that the car doors on such freight train were shut, and sealed with tin seals, which on examination, after the arrival of the train in Chicago, were found to indicate no evidence of having been broken, the witnesses expressing the opinion that the car could not have been entered without disturbing the seals so as to be readily detected. The jury found the accused guilty, thereby giving no credit to his evidence. On motion for a new trial, affidavits of several persons were produced, one of them being a witness who had testified for the People, who, after experimenting with car doors fastened and sealed as the cars on the train spoken of were, stated on oath that they found that cars fastened the same as the one the accused claimed to have entered, could be opened and closed leaving the seals in apparent good order, and without breaking or injuring the same, and that they would so testify if a new trial should be granted. The facts stated in these affidavits were not contradicted, nor was anything presented to break their force. The court denied the motion for a new trial: *Held*, that the court erred in refusing a new trial, in order that the newly discovered evidence might be heard.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. GEORGE GARDNER, Judge, presiding.

25—104 ILL.

John Keenan was indicted in the court below for murder, and upon a trial was convicted. A motion for a new trial was denied, and the accused was sentenced to death. He thereupon sued out this writ of error.

Messrs. STORCK & SHUMAN, for the plaintiff in error.

Mr. LUTHER LAFLIN MILLS, State's Attorney, for the People.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

The 12th of November, 1879, was the date of the assembling of an immense concourse of people in the city of Chicago. Every part of the city was crowded with strangers. At such times evil-doers abound, and become active. During the night of that day, and about four o'clock in the morning of the 13th day of November, the residence of Mr. Hensley, situate on DeKalb street, in the western part of the city, was entered by burglars, and Hensley received three gunshot or pistol wounds, producing almost immediate death. The other members of the family, aroused from their slumbers, came to the scene, and found Hensley in a dying condition. He said nothing tending to identify the murderer or murderers. His mother saw one man escape through the front doors, which were at that time open. A revolver was found near where the deceased fell. A shoe was also found in the vestibule, between the doors leading to the street. A window in the basement story was found to have been forced open, and a screw-driver was also left by the invaders. Some clothing was taken from the room in which deceased had lodged, which was afterwards found, but there were no circumstances shown in connection with the screw-driver or the clothes in any way tending to the identification of the offenders.

Although the police officers made every effort to solve the problem, and ascertain who committed the terrible crime, no further light was discovered on that subject until about the

month of June or July, 1881,—nearly a year and a half after
the murder.    About that time, Habercorn, the principal wit-
ness in this case, gave to the police a statement, in substance
the same as that sworn to by him on the trial.    The sub-
stance of his testimony on the trial was, that for a short
time before the murder Keenan and two other men (Conners
and Riley) were often together at a saloon kept by the witness,
and that on the night of the 12th of November, between ten
and a half o'clock that night and midnight, these three men
were at that saloon, and engaged in "a fuss among them-
selves," or animated dispute, about some matter; that at
that time the witness was engaged playing pool on a billiard
table, with a man by the name of Wallace, and did not hear
what these men said to each other, or know what was the
subject of their dispute; that while witness was so engaged
playing pool, Keenan called him to one side, and asked the
witness for the loan of his "gun," and that the witness
stepped behind the counter and gave Keenan a revolver.
Soon after this Keenan again called him aside, and asked
him for a bottle of whisky, and the witness went again behind
the bar and gave Keenan a bottle of whisky, and the three
men, Keenan, Conners and Riley, at once went out together,
Keenan taking with him the revolver and the whisky, and
the witness returned to the billiard table and for a short time
continued the game with Wallace, but very soon quit.    Wal-
lace went away, and the witness closed the saloon for the
night, and slept that night in the saloon, and on the billiard
table.    The revolver which was found shortly after the mur-
der, on the floor near where the deceased fell, was presented
to the witness at the trial, and he testified that the same was
his property, that he had owned it for several years, and that
it was the same revolver that he loaned to Keenan the night
of November 12, 1879, as before stated.

    The witness also testified that it was about midnight when
he closed the saloon, and that Keenan and his companions

left the saloon that night about ten minutes before midnight. He further testified that on the next morning, about five o'clock, he was roused by a rap upon a rear or side door of the saloon, and on opening the door, Keenan, Conners and Riley came in together, and called for drinks, but before getting the spirits, approaching steps on the sidewalk were heard, and these three men at once concealed themselves in a stairway behind the bar, one of them saying, "cheese it,— cheese it," which he said was a phrase among thieves; that the footsteps proved to be those of some teamsters who habitually came into this saloon very early for their drinks, before going to their work; that the teamsters stayed but a few minutes, and when they left, the three men in question came from their hiding place and got drinks, and soon went away together.

The witness testified further, that while these three men were in his saloon on that morning, he observed that Riley had on but one shoe, and he asked him, "Where is your other shoe?" to which Riley replied, "Keenan or Conners throwed it down the sewer." Riley asked for a pair of shoes, and the witness gave him a pair of his old slippers which were behind the bar, and Riley wore them away that morning. He also testified, that while these men were at his saloon on that occasion he asked Keenan for his pistol, and Keenan replied: "We had a pretty hard time; I got the run; I lost it; I will square up with you, or I will get you another." He further testified, that during that day (November 13, 1879,) he read in a city newspaper an account of the murder of Hensley, and that after that, and about six o'clock that afternoon, Keenan and Riley came to him, and Keenan, calling him aside, said, "Can you keep a secret?" and the witness replied, "I know what the secret is—I will keep it;" and they said, "We will depend on you." The talk was here interrupted by others coming up, and they went away. He further testified, that on the 11th of December, 1879, he was himself

arrested and put in jail in Chicago; that Keenan was arrested and put in jail about a month before he was; that he was kept in jail until the 16th of July, 1880, when he gave bail, and was enlarged; that Keenan was in the same jail with him until about three weeks before the witness got out on bail, but not in the same cell; that some time in June, 1880, Keenan was taken from the jail to the penitentiary, and on the morning of the day Keenan was taken away, Keenan stopped at the door of witness' cell, and handed to him certain papers and a package of clothing to take home, saying when he gave the papers, "Read that, and don't let any one see it." These notes the witness produced, and they were read to the jury, and were as follows:

"FRIEND LOT: When you write to me sine your name Frank Young  In all your letters send your address if them partys should turn up, let me know by saying business is bad and if they should trow up their guts you put a mark on the end of the paper like the one is on this but not so big, just so that I çan see it.  If them partys should turn up, and say that thing is yours and that you gave it to me you keep still and I will say it is mine and get you out of it if I got to put myself onto it dont fail to write and sine your name frank young by by."

"FRIEND-LOT:  tell Kitt Mcquaind and Frank McQuaid to write to me  good by  lott I hope that you will get out  you may have my best regard  to all friends  You dont noe how bad I feel  as bad as a stub-tail mule in fly time  I wish to god that you was out  lott I will feel weary until you will get out  good by."

Habercorn further testified, that he and Keenan, while in jail together, often talked about the Hensley murder; that he was afraid the revolver would be traced to him, and often told Keenan so, and that Keenan always told him "not to be

scared,—that they could not prove it;" that witness often said to Keenan, "if those other fellows were caught they might peach, and he (the witness) would be in a fix," and that Keenan never told him anything else about this murder. This witness further testified, that in 1881, after Keenan had been brought back from the penitentiary to the jail, and after the witness had told the police what he knew, and before the indictment in this case was found, he went to the jail to take Keenan's clothes to him, (which witness had kept for him while he was away,) and at the jail had another conversation with Keenan, in which witness expressed apprehensions that Riley would be captured and would turn State's evidence, and put the witness into the thing as deep as any of them, to which Keenan replied, "You are always troubling yourself about that revolver; Riley never will weaken—Riley will never say anything." On cross-examination this witness said he was still under indictment for receiving stolen property, and for burglary.

There was no other evidence introduced by the prosecution tending in any way to connect Keenan with this murder. This testimony, if true, presents circumstantial evidence tending strongly to convince the mind that Keenan was the murderer, or at least one of the party by whom the murder was committed.

Wallace, of whom Habercorn spoke as playing pool with him, was not called by the prosecution. Being called by the defence, he testified that he had been an employé of the firm of Fuller & Fuller for six years; had known the witness Habercorn for about three or four years, and used to be in his saloon nearly every night; that on the night of the murder (November 12, 1879,) he played pool in Habercorn's saloon, and it must have been along towards midnight before he left, and that he does not remember of seeing Keenan there that night; that he supposes if he had come up and spoken to Habercorn he would have seen him, but might not

remember it. If there had been quarreling he would remember it. If Keenan had interrupted the game to borrow a revolver of Habercorn, and soon after had again interrupted the game to get a bottle of whisky, it is likely it would have attracted his attention,—but he saw no such thing as that. Witness said his memory was not very good.

Keenan testifies, in his own behalf, that he had known Habercorn some eight months before the date of this murder; that he spent much of his time at his saloon; that he knew Conners and Riley, and associated with them; had roomed awhile with Riley, and had been with them at Habercorn's; that he saw Habercorn on the 11th and 12th of November, 1879,—on the 12th in the forenoon, and also about four or five o'clock in the afternoon,—and that he was again at the saloon and saw him there about ten o'clock on the morning of the 14th of November, shortly before he was arrested on the bridge, but he swears he was not at that saloon on the evening of the 12th in company with Riley and Conners; that Habercorn never lent to him a revolver in his life; that he met Habercorn often while they were in jail at the same time; that he had sent notes by Habercorn to other fellows around the jail when Keenan was confined in his cell and Habercorn was working in the halls; that he never saw the notes read in evidence until they were produced on the trial; that he never wrote such a thing in his life; that the handwriting of the notes is not his, although in some respects it is like his writing, but something different; that he never wrote them or gave them to Habercorn; that he did give Habercorn his clothes, and may have given him a note with them; that he had given him a note about a burglary,—the Finiger matter,—and he thinks the end of it was "good-bye." It was that burglary to which he (witness) had pleaded guilty, and he did so to keep Habercorn out of trouble; that Habercorn and others were with him when that burglary was committed, on the 11th of November, 1879; that it is true

Habercorn brought to him his clothes after the return of wit-
ness from the penitentiary, but nothing was said about the
Hensley murder, and that he does not know where Riley or
Conners is.

Keenan also testified, that in the afternoon of the 12th of
November, 1879, at about four or five o'clock, he left Haber-
corn's saloon and went to the corner of Kinzie street and
Western avenue, and between six and seven o'clock he
boarded a freight train and went to Oak Park, a station
about nine miles west of Chicago, getting there about ten or
eleven o'clock at night; that three other men (whose names
he gives) were with him; that they went out there for the
purpose of committing a burglary upon a house about a
mile and a half south of that station; that on arriving
in front of the house they made no attempt to enter,
because of the barking of a fierce dog on the premises,
and because there was a light burning in a window on one
side of the house, and so they loitered about awhile and
then returned to Chicago. On their return, after reaching
Oak Park they caught a freight train there. It was moving
slowly, and they got on about four o'clock on the morning of
the 13th; that they went into a freight car through the *end
doors between the cars;* that that car was not empty, but con-
tained *some stove pipe* and some *bales* or *bundles* of some kind,
*containing something soft,* it appeared like; it was dark in the
car; they staid in the car till it reached Chicago, about six
or seven o'clock in the morning, (it was about daylight,) and
they got off on Kinzie street, west of Western avenue, and
that after getting off that train that morning he (Keenan)
came down on Halsted street, near Jackson, and there got his
breakfast. The witness also testified that he loitered about
the city through the day of the 13th, and on that night lodged
at his own room on Harrison street, coming in about eight
or nine o'clock, and that on the 14th, about noon, when
crossing the river going east, he was arrested on the bridge,

and after a few days' confinement at the station was committed to jail upon two charges of burglary, and has been a prisoner ever since.

In corroboration of Keenan's story as to his whereabouts on the night of the 12th and the morning of the 13th, (the time of the murder,) he produced credible witnesses, employés of the railroad company, who testified, in substance, that freight trains did pass on the railroad leading from Chicago to Oak Park, towards Oak Park on the night of the 12th, and returning to Chicago through Oak Park on the morning of the 13th, about the time indicated by his testimony; and by other witnesses, that about one and a half miles south of Oak Park, on the roadside, there was at that time a house occupied by a family, and that at that place there was then kept a fierce dog, much given to barking in a threatening manner at night, and that at that time there was an invalid in that family whose wants required attention frequently through the night, and that it was the custom on such occasions to have a light in the room occupied by the invalid.

To further corroborate this story of Keenan, Mr. Birdsall, a clerk in the freight department of the company operating the railroad in question, testified that in June or July, 1881, the attorney employed in Keenan's defence called upon him with a memorandum, and at his request witness examined the record to ascertain the contents of the freight cars which came in through Oak Park on the train indicated on the morning of November 13, 1879, and that to do so he had to search books of that year which had been put away for safe keeping; that on examination it was found that a freight car, numbered 5614, of that train contained, among other freight, *twenty-eight bags of rags* and a lot of household goods and *stove pipe*, and that no other car of that train contained rags or stove pipe. On cross-examination he said rags were a very common article of transportation. Such freight comes

on nearly every train, and stove pipe is frequently an article of transportation of that road. Mr. Brinkerhoff, the local freight agent, and Mr. Waite, the tally clerk, gave testimony showing the same thing. It was also shown, on examination of Mr. Birdsall, that there are at least two books in which the record of the contents of arriving cars are kept; that one of these is called the delivery book, and that this book was kept in the delivery office, accessible to almost anybody wishing to examine it, and generally open to the public for inspection.

To show that Keenan did not return that morning from Oak Park in car number 5614, and that his story and its corroboration were manufactured, the prosecution called Charles Boedecker, who, in November, 1879, was night watchman and switchman at Park station, which is a short distance farther east than Western avenue, where Keenan says he got off the train on the morning of the 13th, and Frank C. Waite, the custodian of the seal record kept at the State street station, which is some two miles further east than Park station, and Mr. Brinkerhoff, the local freight agent at Chicago, who, after an examination of the seal records of the company, testified, in substance, that the railroad company had at that time, and now, a mode of sealing the doors of freight cars in such a manner that, in their opinion, the door so sealed could not be opened and closed again without making the violation of the seal apparent to an inspector, and also showing that the cars of the train which brought in on that morning this car number 5614 were duly inspected at Park station, and also at the station on State street, and the result of the inspection then and there was entered on their seal records, and that from those seal records it appeared that both at Park station and at the State street station the end doors of the car numbered 5614 were both sealed with a tin strip, in the manner described by the witnesses, and that the seals were on the doors on both

ends of the car in good order on the arrival of the train at both of these stations.

On this evidence it became absolutely necessary that the jury should determine whether Habercorn or Keenan had spoken the truth in the matters wherein their testimony is at variance. The jury found the prisoner guilty, and thereby necessarily found that his (Keenan's) story of his trip to Oak Park was manufactured and false. It can not be known that they would have so found in the absence of the testimony of the three witnesses, Birdsall, Waite and Brinkerhoff, showing that they all were familiar with this mode of sealing cars, and that in their opinion the sealing was of such a character that the car could not be opened and closed without making the violation of the seal plain to the inspector. This evidence, if correct, seems most forcibly to lead to the belief that Keenan's story in this regard was false, and entirely manufactured.

After the verdict came the motion for a new trial. On the hearing of that motion affidavits were read of Frank C. Waite, the employé of the railroad company who, on the trial, had testified to the security of this mode of sealing cars, and also of Frank McQuaid, a friend of Keenan, showing that after the trial, and on the 8th of September, 1881, McQuaid went with Mr. Storck, one of Keenan's attorneys, and experimented upon cars fastened and sealed precisely as was car 5614 when it came into Chicago on the morning of the 13th of November, 1879, and found that the same could be opened and closed leaving the seals in apparent good order. These affidavits also show that like experiments were made by Mr. Waite in the presence of Mr. Shuman, Mr. Storck, and other gentlemen, with like result, and Mr. Waite swears that by such demonstrations he ascertained that "it is an easy thing to open the end window or door of a box freight car which is secured or fastened with a tin seal," as described, "without breaking or in any way injuring or impairing the seal," and

that a car door of this kind, sealed in that way, can easily be opened and the car entered, and after coming out the door can be closed without injury to the seal, or showing to an inspector in any way that the car has been opened, unless he actually tried the door or window. Mr. Waite swears that he is familiar with this mode of fastening, and understands what he is speaking about, and that if a new trial be granted he will so testify.

The affidavit of an expert was also presented, tending to show that the notes produced as given to Habercorn by Keenan in the jail, are probably forgeries, and not in the handwriting of Keenan.

Nothing was presented on the hearing of the motion tending to break the force of these affidavits, and no reason is suggested why they are not entitled to belief. The truthfulness of Waite is conceded by the prosecution, who produced him as a witness. If it be not true that these sealed cars can be thus opened without detection in that way, it is a fact easy of proof. We must believe it is true. If this be so, it is plain that Keenan did not have a fair trial before that jury. His story had at the trial to be weighed against that of Habercorn by the jury, while under the belief that it was impossible that this car could have been opened and closed in the way he stated without immediate discovery of the fact that the car had been opened. This of itself was decisive against the truth of his story.

The motion for a new trial ought to have been granted. It was error to deny it. For this error the judgment of conviction is reversed, and the cause remanded for a new trial.

*Judgment reversed.*

WALKER, SHELDON and SCHOLFIELD, JJ., dissent.