# THE STATE v. NELSON, Appellant.

### Division Two, December 17, 1901.

1. **Self-Defense:** EVIDENCE OF PREVIOUS DIFFICULTIES: THREATS. Where the defense is self-defense, evidence of a previous quarrel between deceased and defendant, in a murder trial, and of threats by deceased, whether communicated or not, is admissible for the purpose of throwing light upon the conduct of the deceased at the time of the encounter, and as affecting the reasonableness of defendant's own conduct, and where there is a conflict as to who was the aggressor, as tending to show who was the aggressor.

2. ————: ————: RES GESTAE. About noon of the day of the killing, which occurred soon after six o'clock in the evening, deceased approached the little crowd with whom defendant was in conversation, and without the slightest provocation applied the most brutal and insulting epithets to him, and struck him a blow on the forehead, and threw him to the floor and was beating him when the bystanders pulled him off. As deceased went away he again applied revolting epithets to defendant and threatened his life. They did not meet again until a few moments before the fatal encounter. At the trial defendant testified that from the action of deceased and the demonstration he made he thought deceased intended to kill him and he shot to protect himself. *Held,* that the previous difficulty was a part of the *res gestae,* and as such, the whole matter, including what was said and done by both parties and all the details, was admissible in evidence. And especially should such evidence be admitted as the State has been permitted to show that defendant pursued deceased with a lemon squeezer after the close of that difficulty.

3. ————: ————: ————: CUMULATIVE EVIDENCE. And where the only testimony in regard to such difficulty, is the deposition of one of defendant's witnesses, and the oral testimony of an opium-eater, the exclusion of the testimony of the other eyewitnesses can not be justified as being mere cumulative. Such error is not harmless.

4. **Difficulty in Which Defendant has no Part.** All reference to a difficulty between deceased and others, at which defendant was not present, and in which he had no part, is irrelevant and should be excluded, whatever may be the defense.

State v. Nelson.

5. **Juror:** REFUSAL TO TAKE OATH. A juror stated he was opposed to capital punishment but "if I took the oath I would follow my oath, but I have not taken the oath yet." When the jury was asked to rise and be sworn, he remained seated, and on being ordered to stand up, asked if the case was not a murder trial, and on being told it was, said: "I refuse to take the oath." He was ordered to stand up and raise his hand, which he did, and then the oath was administered to the jury as a whole. *Held*, that the record reciting that the oath was administered to the jury as a whole, the presumption must be that the juror concluded it was his duty to be sworn, and took the oath with a sense of his responsibility to the State and the defendant, and thus became one of the panel.

6. **Instructions:** REJECTION OF ALL OF DEFENDANT'S. Where the instructions given by the court declared the whole law of the case, no error was committed in refusing all offered by defendant, though some of them were correct.

Appeal from Jackson Criminal Court.—*Hon. Samuel Davis,* Special Judge.

REVERSED AND REMANDED.

*Hugh C. Brady* and *A. O. Harrison* for appellant; *S. C. Price* of counsel.

(1) The court erred in retaining Powell as a member of the jury to try this cause, and in compelling him, in spite of his refusal to be sworn, to stand up with the other jurors and raise his hand when the oath was administered to the jury. "An oath is an outward pledge given by the person taking it, that his attestation or promise is made under an immediate sense of his responsibility to God." 16 Am. and Eng. Ency. Law, 1018; Tyler on Oaths, p. 15; 2 Bouv. L. Dict., art., Oaths; Constitution, art. 2, secs. 28 and 30; 17 Am. and Eng. Ency. Law (2 Ed.), 1095; R. S. 1899, sec. 2614. It will not meet the case to say that the opposition of this man to capital punishment was a fact in defendant's favor. Defendant, under the Constitution, had a right to have his case passed upon by twelve jurors, competent under the law. He had the right

to have a verdict which represented the unanimous judgment and concurring conscience of twelve men, and to have that verdict rendered under oath. What interest this man may have taken in the proceedings, or whether he participated in the deliberations of the jury, or whether he was actively consenting or merely passive in the rendering of the verdict, this record does not disclose, but our contention is that he was not a sworn juror, and so was not a juror at all, and however active an interest he may have taken in the proceedings, or however heartily he might have concurred in the verdict, as rendered, does not make that verdict a lawful verdict under the Constitution or laws of this State. State v. Welsor, 117 Mo. 570; State v. Bockstruck, 136 Mo. 335; State v. Withrow, 133 Mo. 500; Bank v. Anderson, 1 Mo. 244; Vaughn v. Scade, 30 Mo. 603; In Re Essex Avenue, 121 Mo. 103; Thompson v. Utah, 170 U. S. 343; Bible v. People, 67 Ill. 172; Manus v. McDonald, 107 Ill. 104. The constitutional guarantee that the right of trial by jury, as heretofore enjoyed, shall remain inviolate, makes the right of defendant in this case to a jury of twelve men a constitutional right, and being charged with felony this right could not be waived by defendant, even if the action of the court with reference to compelling Powell to stand up to hear the oath pronounced to the jurors with the others, and raise his hand, had not been objected to by defendant at the time. State v. Mansfield, 41 Mo. 470; State v. Robertson, 71 Mo. 448. (2) The court should have admitted evidence as to all the facts and details of the difficulty between defendant and deceased at noon of the day of the homicide. The court admitted evidence of the fact of a difficulty between defendant and deceased at that time, but ruled out all evidence as to the circumstances and details of that difficulty. The noon difficulty was a part of the *res gestae* of this case. State v. Dettmer, 124 Mo. 432; State v. Testerman, 68 Mo. 414; State v. Kennade, 121 Mo. 413; State v. Raper, 141 Mo. 327.

Vol 166 mo—13

*Edward C. Crow,* Attorney-General, for the State.

(1) The law is that the fact that a juror is opposed to capital punishment proves nothing, but he must have conscientious scruples against the death penalty. The fact that a juror is opposed to capital punishment on principle does not imply that he has a conscientious opinion which would preclude him from finding a prisoner guilty in a capital case. Savage v. State, 18 Fla. 955; 1 Bishop's Criminal Procedure (4 Ed.), sec. 918. Conscientious scruples against the infliction of the death penalty, it has been held, do not disqualify, if, notwithstanding the scruple, the juror will render a proper verdict. Adkins v. State, 16 Ark. 568; Stallion v. State, 5 Col. 276; Com. v. Webster, 5 Cush. (Mass.) 295. The finding of the trial court as to the qualification of jurors will not be disturbed unless it appears that manifest error has been committed. State v. Williamson, 106 Mo. 162; State v. Bryant, 93 Mo. 273; State v. Brooks, 92 Mo. 542; State v. Greenwade, 72 Mo. 298. Whether the juror stood indifferent between the State and the defendant was a fact which the court under our laws was required to determine, and his finding will not be disturbed unless manifest error occurs. State v. Bauerle, 145 Mo. 15. There is nothing in the record that shows that the court acted improperly. The contention of the appellant is that the witness was not sworn. The record shows that the witness was sworn. The statement of the counsel for the appellant will not be held to contradict the record. Wharton on Crim. Law (9 Ed.), 835; 5 Wall. 62. Defendant can not set up this ground of disqualification. The accused has no right to set up opposition to capital punishment as grounds for the disqualification of a juror, it being available only to the prosecution. Murphy v. State, 37 Ala. 142; Wesley v. State, 61 Ala. 282; Harmon v. State, 79 Ala. 29; State v. Togan, 56 Kan. 61; State v. Campagnet, 48 La. Ann. 1470. (2) The court admitted evidence of the details of the difficulty at noon.

The testimony of Dustin and the deposition of Hook show the details of the fight at noon.   For these reasons, the court admitted and offered to admit all the testimony that was legally necessary concerning the difficulty at noon.   State v. Dettmer, 124 Mo. 433.   (3) While it is true the character, conduct and utterances of the defendant and the deceased and their relations to each other, tending to show their feeling and the motives, if any, for the commission of the crime, are admissible, yet, as to prior fights, the rule is that a previous difficulty between the same parties will only be admissible if both are so connected that one is of the *res gestae* of the other; otherwise not.   2 Bishop on Criminal Procedure, sec. 262.   The length of the interval between the two is immaterial.   The prior difficulty and the fight at noon was admitted in this case.   The law is that while the fact of a prior difficulty or fight having occurred is competent, the irrelevant particulars thereof between the defendant and the deceased can not be shown.   2 Bishop's Criminal Procedure, sec. 630; Tarver v. The State, 43 Ala. 354; Pound v. State, 43 Ga. 88; McLean v. State, 16 Ala. 672. The mere question as to who was right or wrong in the previous difficulty is not material and not to be considered by the jury, but the fact of the difficulty itself, in order to show the temper of the parties when they subsequently met and the homicide occurred, might properly lead the jury to an understanding of the acts of the relative parties and their conduct at the time, and this is the principle that underlies the rejection of the testimony concerning the details of the prior difficulty, and admits the fact of the difficulty itself.   Of course, if any connection be directly shown between the two encounters, such as to disclose that they both formed a part of one transaction then the testimony would have been admissible.   But if it was an independent matter, as it was in this case, it was improper to admit the testimony as to the details of the previous difficulty.   State v. Clayton, 100 Mo. 520; State v. Parker, 96 Mo. 389; State v. Jackson, 95 Mo. 623; State v. Taber, 95 Mo. 585.

GANTT, J.—At the January term, 1900, of the criminal court of Jackson county, the defendant was indicted for murder, in the first degree, of one David Jones.

The homicide occurred on January 2, 1900, at what is known as the Star saloon on Union avenue, nearly opposite the Union Station, in Kansas City, Missouri.

As the indictment is in the usual and approved form, and is conceded to be sufficient, it is deemed unnecessary to reproduce it in full. The defendant was duly arraigned and pleaded not guilty. It appears he has been twice tried. There was a mistrial on the first trial. The facts in evidence on the last trial are substantially these:

The defendant was a barkeeper at the Star saloon and the deceased, Jones, had also been a barkeeper in the same saloon prior to the homicide, but was not at that time, but was boarding at the Adams House, a lodging house immediately above the said saloon.

The evidence of the various witnesses is conflicting.

The entrance to the saloon from the street is through a ticket broker's office in front. Opening from this office into the saloon are folding doors. Immediately in front of these folding doors, about four feet inside of the saloon, is a stationary screen about five feet wide. The doorway into the saloon is on the left as you go into the office. On the right side and in the rear of the office is a stairway leading to the hotel above. At the fifth step of this stairway are swinging doors, which when shut, close this stairway passage. About noon of the day of the killing, Captain Haley of the Salvation Army, with Lieutenant Burke of the police, went into this ticket office to see a Mr. Dustin. The man Dustin was in Kansas City, as he testifies, to take treatment for the morphine habit, and Captain Haley wanted him to come and stop at the Citadel, because he thought the surroundings and influences there would be better than at the Adams House, the hotel over this saloon, where he was then stopping. Jones, the deceased, was also stopping

there.   It appears that Dustin had been at the Adams House for some time, and was a frequenter of the Star saloon and a liberal patron of the bar.   He had become acquainted and more or less intimate with the people about the hotel, office and saloon.   While Lieutenant Burke was talking to Dustin, the defendant came and wanted to know what the police officer wanted with him, explaining that he was a friend of Dustin, and insisted that he, Dustin, had been well treated by everybody there.

While these men were talking, Jones, the deceased came up, and remarked to some one that it was not necessary for them to have anything to do with that son-of-a-bitch Nelson, and Nelson and deceased came near having a difficulty at that moment.   The conversation between Burke, Haley, Dustin and Ambs, the ticket broker, was continued at or near the swinging doors of the saloon, and deceased and defendant were standing back, when suddenly the others became aware of the fact that the deceased and the defendant were engaged in a fight, and in a few seconds they were on the floor, with the deceased on top of the defendant striking and hitting him, and both men were very angry and very belligerent.   Ambs and Haley and Burke interfered and separated the men and pulled Jones off of the defendant, and the testimony of the defendant's witnesses shows that at about this time Jones threatened that he would kill defendant, and the testimony for the State shows that as another bartender, Mr. Ward, assisted the defendant into the rear of the saloon to wash himself, defendant said he ought to kill the deceased.

The court permitted the fact of this difficulty to be proven, but excluded evidence with reference to the circumstances and details of it.   In this fight defendant was knocked down and beaten by deceased, and struck over the head, as defendant testifies, with a pair of brass knucks.   The deceased was pulled off of defendant and they were separated.   Jones went up the stairs leading to the Adams House, and it is agreed

that defendant went to the foot of the stairs, some say up five steps, to the folding doors, with a lemon squeezer in his hands. Defendant testifies that he went back to the bar after the fight, and Jones came in, still threatening, and he picked up the lemon squeezer and followed him out, Jones running up the stairway. Other testimony tends to show that Jones went up the stairway without going into the saloon. Several witnesses testify that after defendant and deceased had been separated, deceased threatened to kill defendant before sundown, repeating the threat in other forms; that this threat was made in a loud voice, so that defendant could have heard it. There is also evidence of a previous threat by the deceased against defendant, and that this threat had been communicated to defendant.

After this noon difficulty defendant went to his room on Wyandotte street, a half-mile or more away from the Star saloon, and slept during the afternoon, returning to the saloon a few minutes before six o'clock, to go on duty again at that hour. When he came into the ticket office he was informed by Ambs that Mr. Dowling had told him to pay him off and that his services were no longer needed. Ambs testifies that at this time defendant took his revolver out of his overcoat pocket, and while holding it in his hand said that if the deceased did not apologize for the way he had talked to him, he would kill him. Defendant testifies that having heard the threats of deceased against him, he put his revolver in his pocket after going home for the purpose of protecting himself against possible assault; that Ambs, when he told him he was discharged, asked for the key which he usually carried in his right-hand overcoat pocket; that he took out the revolver and his handkerchief, put them in his left hand, and searched with his right hand in his pocket for the key and failed to find it, but denies making the threat testified to by Ambs.

Defendant after being paid off had some conversation with Ambs to the effect that he thought he should have

been paid for a week's work on being discharged without notice, but accepted the payment and invited Ambs to take a drink with him. He and Ambs went into the saloon, Ambs taking a cigar and defendant a drink of whiskey. Ambs went back into the ticket office, leaving defendant still in the saloon. After taking his drink, defendant came into the ticket office, and finding the key in his right-hand trouser pocket, gave it to Ambs, but Ambs's testimony is that he did not ask for the key at the time he told defendant that he was discharged, and only spoke of it after defendant came out of the saloon following the cigar and the drink.

Defendant went back into the saloon a few minutes later, and while standing near the door deceased came into the saloon, passed near defendant, made some remark to the porter and went out. There was no hostile demonstration on the part of either defendant or deceased at that time, although defendant testifies that when he saw in the mirror deceased coming in, he turned around so as to face him.

Shortly afterwards, deceased came to the door of the saloon. Ambs testifies that after going to the door of the saloon, deceased turned back into the office, and that defendant came and called him into the office. Defendant's testimony is that upon seeing deceased come to the door he went towards the door and met him and they walked into the saloon together, he having his right hand on deceased's shoulder, and in this way walked towards the bar, that defendant said to the deceased, "Now, Dave, be a good fellow and apologize." The deceased in a very angry manner said he had nothing to apologize for, and put his hand in his pocket and assumed a very threatening attitude, that defendant saw what he thought to be the butt of a revolver, and thinking deceased was about to murderously assail him, he drew his revolver and fired the fatal shot.

The testimony of Ward, the barkeeper, is to the effect that defendant called the deceased into the saloon, drew his revolver, covering the deceased with it, and told him to apologize or he

would kill him, and told deceased to take his hands out of his pocket, and asked him what he had in his pocket; that deceased threw up his hands, and answered that he had nothing, and said in a mild way that he had nothing to apologize for, and that defendant then shot deceased. Defendant also says that when he saw the deceased put his hand in his pocket, he told him to take his hand out of his pocket, and asked him what he had, that deceased said he had nothing, and that at that point he assumed the threatening attitude above mentioned. After being shot deceased made an exclamation that he was shot, walked out of the saloon and partly up the stairs, and was carried the rest of the way and put in a room.

Defendant after the shooting went to his room, told the landlady that he had had trouble, and went to a coalshed in the yard, where he was shortly after arrested. Evidence shows that the woodshed door was locked, and that defendant.made no resistance to the arrest. Several witnesses testified that they did not know of deceased's having any brass knucks and that no revolver was found on his person after he died. The testimony leaves room for some uncertainty as to whether or not a weapon might not have been taken off the body of the deceased, but there is no positive evidence that he had a weapon upon him.

The trial resulted in a verdict of murder in the second degree and the punishment assessed at ten years in the penitentiary, and defendant appeals.

A reversal of the sentence is sought on numerous grounds, many of which it will not be necessary to examine critically, owing to the conclusion we have reached in the case.

I. It appears from the record that after Dr. Langsdale had testified as to the wounds which caused the death of Jones, William Ambs was called in behalf of the State and, without introduction or reference to a fight between Jones, the deceased, and the defendant, Nelson, he was asked this question: "Q. At the termination of this trouble between Mr. Jones and

Nelson did you hear Mr. Jones make any threats towards Nelson ?"

From this witness and the other witnesses for the State, the counsel for defendant sought in vain to ascertain what was the trouble between Jones, the deceased, and defendant, how it occurred, and who was the aggressor, and what if any provocation defendant had given to bring on the difficulty in which, from an unguarded answer of Ambs, it appeared that Jones had defendant down and was pulled off of him by Walls and Ambs. The defendant insisted then that he had the right to have the facts of that difficulty presented to the jury in order that they might understand the subsequent conduct of the two men, that it was a part of the *res gestae,* but the court excluded the details save as hereinafter stated, and this action of the court in excluding these facts is assigned as error. To this contention the Attorney-General answers that the details of the difficulty and fight between the deceased and defendant, about noon of the day on which the homicide occurred, were not competent, but if there was error in excluding them it was cured by admitting the evidence of Dustin and the deposition of Hook on behalf of defendant.

From the offers made and from the deposition of Hook, enough is gleaned to show that on the day of the homicide, about noon, Captain Haley of the Salvation Army and a police officer had come to the Star saloon, in which defendant was serving as a bartender that day, and were endeavoring to get one Dustin to accompany them to the Salvation Army's citadel. That defendant rather resented the implication that Dustin was not properly treated at the Adams House and was inquiring of the officer and Captain Haley by what authority they were taking him away, when Jones, the deceased, came on the scene and without the slightest provocation applied the most brutal and insulting epithets to defendant, and struck him a blow on the forehead and threw him to the floor, and was beating him when the bystanders pulled him off. As

deceased left the bar-room after thus assaulting defendant, he again applied the most revolting and insulting epithets to defendant and threatened his life.   Defendant did not meet or see deceased after this until a few moments before the homicide occurred.   He testified that from the action of deceased and the demonstration he made, he thought deceased intended to kill him and he shot to protect himself.

In State v. Dettmer, 124 Mo. loc. cit. 433, it was said by this court:   "The rule is universal in its acceptation, that evidence of other crimes, of other fights between the same parties, or between one of them and some stranger, may be received wherever and whenever such testimony, otherwise inadmissible, has any tendency to elucidate any pending investigation or to discover hidden springs which prompted any litigated step or action."

The defense in this case was self-defense.   In such cases, it is settled law, that evidence of a previous quarrel between defendant and deceased, and of threats by deceased against defendant, whether communicated or not, is admissible for the purpose of throwing light upon the conduct of the deceased at the time of the encounter, and as affecting the reasonableness of defendant's own conduct, and where there is a conflict as to who was the aggressor as tending to show who was the aggressor.

After a careful consideration of all the evidence, we are clearly of the opinion that the difficulty which took place at noon on the day of the homicide and at the last meeting of deceased and defendant and only about six hours prior to the fatal shooting, and which was renewed as soon as they met again, was a part of the res gestae, and in such a case the whole transaction, what was said and done by both parties and all the details are admissible to throw light upon the guilt or innocence of the defendant, and in explanation of his subsequent conduct, while other previous difficulties are only admitted when they have a tendency to elucidate the pending

investigation and to show the motive, express malice or unfriendly feeling between the parties without going into the details thereof.

As the noon difficulty was a part of the *res gestae,* the court erred in excluding the evidence offered by defendant, tending to prove deceased was the aggressor, and what was said and done at that time by both deceased and defendant.

The jury were deprived of the knowledge of the intense dislike which deceased clearly entertained toward defendant, and apparently without any cause, unless we can surmise that he was smarting under the fact that defendant was employed in a position which he once held. But before the jury could properly measure the apprehension of danger which defendant would naturally entertain, they must know of the unprovoked assault which deceased had made on defendant when they had last met only a few hours previous.

Defendant was entitled to have them advised of the deadly threat made by deceased against defendant at the termination of that difficulty so that they might properly appreciate the view which he would take of any hostile demonstration made by deceased when they met that evening. [State v. Sloan, 47 Mo. 604; State v. Elkins, 63 Mo. 159; State v: Hollingsworth, 156 Mo. 178; State v. Rel Smith, 164 Mo. 567.]

Having reached the conclusion that this evidence was admissible, we advance to the proposition that no error was committed in excluding it, because the court admitted similar evidence in the deposition of Fred Hook, and of Dustin, the opium-eater.

It is an accepted principle in appellate practice that error is presumptively hurtful to the party against whom it is committed, and it devolves upon the opposite party to show that the error was harmless. This the State endeavors to show by the fact that the criminal court admitted the deposition of the witness, Fred Hook, taken at Seymour, Iowa, and the testimony of Dustin, who at the time of the difficulty was con-

fessedly being treated for the opium habit, whereas the testimony excluded was that of Wall, a witness who was present in court and of other witnesses present. It is unquestionably true that ordinarily the rejection of merely cumulative evidence will not work a reversal of a judgment, nor evidence which only tends to establish a fact conceded by the adverse party, but it must be the experience of every judge and lawyer that the evidence of a witness, testifying in person in the presence of the court and jury who may judge of his credibility by his appearance and demeanor on the witness stand, is of infinitely more value and probative effect that the deposition of an absent witness of whom the court and jury know absolutely nothing and of whose personality they can form no opinion by observing his manner and appearance. The deposition of a witness is but a poor substitute for the witness himself. [State v. Howard, 118 Mo. loc. cit. 142-143.]

Neither do we think that the defendant should have been restricted to the evidence of a man addicted to the opium habit, as Dustin confessedly was, when he had other witnesses present to testify to the circumstances of the unprovoked assault by deceased upon defendant, especially when the State was permitted to show the conduct of defendant at the close of that difficulty. The rejected testimony of Wall and others we regard as of vital importance to defendant who was on trial for his life, and the admitted evidence did not supply it, and the State has not shown that the error in excluding it was harmless. It must be borne in mind that it was strongly controverted by the State that deceased made the threat attributed to him by defendant as he left the saloon after the noon difficulty, and that a defendant testifying in his own behalf is always more or less discredited by the very fact of being the defendant on trial. So that while it is true, as already said, that ordinarily the exclusion of cumulative evidence will not justify a reversal, this is no iron rule, and when we consider that outside of his own evidence the defendant was compelled to go to the jury

with the testimony of Dustin, the opium-eater, and the deposition of Hook to counteract the testimony of the barkeeper and Ambs that deceased made no threats, and the further fact that the State was allowed to show that defendant pursued deceased up the steps at the close of the noon difficulty, we think the evidence was clearly admissible even if in part cumulative. [State v. Murray, 91 Mo. 95; State v. Bailey, 94 Mo. 315; Keenan v. People, 104 Ill. 385.] In our opinion it was reversible error, under the peculiar circumstances of the case.

II. On the other hand, we think, no error was committed in excluding the evidence concerning the trouble on the night previous, between Hockaday, Jones, Mrs. Maltby and Dustin. The defendant was not present and had no part or lot in that difficulty, and it was irrelevant to the issue on trial.

III. Another assignment of error is that the defendant was tried by eleven jurors instead of twelve. This point is based upon the following, recited in the bill of exceptions:

On the *voir dire* examination of the panel, one of the said panel, Clem J. Powell, was asked by the prosecuting attorney:

"Where the law and the evidence would justify or warrant a verdict of murder in the first degree, would you concur in such a verdict, knowing the punishment to be death by hanging?"

Answer: "I am opposed to capital punishment."

By the court: "That is not the question. The question is, if you took the oath, would you follow your oath or would you follow your convictions?"

Answer: "If I took the oath I would follow my oath, but I have not taken the oath yet."

When the jury was asked to rise and be sworn to try the case, said Powell remained seated. When ordered by the court to stand up and be sworn, Powell said: "Isn't this a murder trial?" He was informed by the court that it was. He then said: "I refuse to take the oath." He was then

ordered by the court to stand up, which he did, but he did not raise his hand. He was ordered by the court to raise his hand, which he did. *The oath was then administered to the jury as a whole.* To which action of the court in ordering said Powell to be sworn, the defendant at the time objected and excepted.

The question raised by defendant is not whether the juror was not in fact competent to act as a juryman, but was he in fact sworn, notwithstanding he stood up and held up his hand in obedience to the direct command of the judge, after having positively refused to be sworn.

In other words, did this juror take upon himself the obligation to well and truly try the cause wherein the State was plaintiff and the defendant was defendant, and a true verdict render according to the law and the evidence, and if he did not, was he a juror in the sense of our laws.

That he may have been and was guilty of contumacious conduct and liable for punishment by the court for contempt, may be conceded, and still the question which counsel for defendant propounds remains undetermined. If he became a juror under these circumstances, then under the repeated adjudications of this court he would not be heard to discredit (by his own affidavit) the verdict rendered by stating that he took no part in the trial and refused to concur in the verdict after he had consented by his silence to the verdict in the presence of the court and defendant.

On the other hand, if impressed with the fact that he was bound to give a physical obedience to the court, he might have concluded he had done all he could by way of protest and still never have taken upon his conscience the conviction or deliverance of the prisoner. The situation is one which fortunately rarely occurs. Service upon a jury is a duty which the law devolves upon good citizens and should neither be sought nor shirked, but the law recognizes that the opinions of some men are such as to preclude them from finding a ver-

dict of guilty, knowing the punishment will be death, and therefore renders them incompetent to sit in capital cases. We think the court might well have ordered this juror to stand aside with a view of giving the State a juror who was not opposed to capital punishment. In the face of the record, which recites "the oath was administered to the jury *as a whole,*" the presumption must be that the juror concluded it was his duty to be sworn, and took the oath with a sense of his responsibility to the State and the defendant and thus became one of the panel.

IV. We have gone through all the exceptions to the instructions, but in our opinion those given by the court declared the whole law of the case arising upon the facts in evidence, and though some of those offered by defendant were correct, they but repeated the same principles that the court had announced in its own, and no error was committed in refusing them.

It results that the judgment must be and is reversed because of the exclusion of competent evidence tendered by defendant, and rejected by the court.

Judgment reversed and cause remanded for new trial. All concur.