## THE STATE v. JAMES SHARP, Appellant.

### Division Two, March 7, 1911.

1. **CHANGE OF VENUE: Untimely Application: Waiver.** Where the defendant was in custody at the term the information was filed, and the cause was continued to the next term, the defendant should allege in his application for a change of venue based on the prejudice of the inhabitants of the county, that the facts upon which it is founded first came to his knowledge since the last continuance. Yet if the State treats the application as sufficient to raise the issue of the existence of prejudice and introduces evidence on such issue, it will be held to have waived the defect in the application.

2. ————: **Discretion of Trial Court.** Unless the evidence of the prejudice of the inhabitants of the county against defendant is of such a character as to indicate that the trial court abused its discretion in refusing a change of venue, the appellate court will not hold error was committed in denying it.

3. **CROSS-EXAMINATION OF DEFENDANT: No Exception.** A defendant exercising his right to testify in his own behalf, cannot be cross-examined as to any matter not referred to in his examination in chief, and a violation of that immunity will entitle him to a new trial. But where no exceptions were saved to the adverse rulings of the court upon objections to questions asked him, such rulings cannot be reviewed on appeal.

4. ————: **Alternative of Frequent Objections.** Where it is clear that the subject concerning which inquiry is made was not referred to by defendant in his direct examination, the court should not allow a cross-examination that is violative of the spirit and letter of the statute. The defendant should

not be placed in the unfair alternative of either making frequent objections or of answering without objection questions concerning matters not referred to by him in his examination in chief.

5. **EVIDENCE: Competency: Waiver.** If at the time a written statement signed by defendant is offered in evidence by the State, his counsel announces to the court that he has no objection to it, its incompetency is waived.

6. ————: **Fire Arms: Preparation.** It is competent for the State to prove the purchase, and possession at the time of the homicide, of fire arms and weapons by the defendant, to show preparation for the commission of the crime.

7. ————: **Threats.** And where the deceased was a policeman and was killed in an encounter by defendant and others with a number of policemen, it is competent to prove threats made by defendant against the police as a class.

8. **INSTRUCTIONS: Higher. Grade of Offense.** Defendant is not in a position to complain of instructions submitting a higher grade of the offense than that of which he was convicted.

9. ————: **Manslaughter: Intentional.** Where all the evidence, both for the State and defendant, showed an intentional and not an accidental shooting and killing, the defendant is not prejudiced by the failure of the instruction for manslaughter in the fourth degree to require an express finding that the shooting was intentional.

10. ————: ————: **Heat of Passion Not Defined.** A failure to define the words "heat of passion," in an instruction authorizing a conviction of the lower grade of the crime if it was committed in a heat of passion, is an error, if error at all, in defendant's favor, for it relieves him of the necessity of establishing that the heat of passion was caused by a lawful provocation.

11. ————: **Voluntarily Entering Into Difficulty: Murder in First Degree.** If defendant killed deceased, after having voluntarily sought or invited the difficulty with the felonious purpose of killing him or of doing him some great bodily harm, the crime is murder in the first and not in the second degree; and an instruction which tells the jury that the killing, under such circumstances, is murder in the second degree, is a favor to defendant, of which he cannot complain.

12. ————: ————: **Unlawful But Not Felonious.** An instruction which reduces the offense to manslaughter if the defendant began or provoked the difficulty with a purpose unlawful but not felonious, is too favorable to defendant, where the evidence

State v. Sharp.

is that after he had made an assault upon an officer he and his followers immediately went to a police station a block away armed with deadly weapons, lined themselves up, and when the policemen came out of the station used those weapons upon them with deadly effect; for if they provoked the difficulty at all, it was with a felonious purpose.

13. ———: Insanity: Inherent Difficulty. An instruction on insanity, where the defense of insanity is also interposed, is not entirely clear to the ordinary understanding, because of the inherent difficulty in presenting the subject, in all its bearings, to the jury, in a few plain words. But it is not to be condemned on that account, although long, if it is a correct statement of the law.

14. ———: Refusing Defendant's. When a proper instruction fully covering the subject, is given, it is not error to refuse another on the same subject, even though it be a correct statement of the law.

15. REMARKS OF COURT. Remarks of the court, in the presence of the jury, complimentary of the prosecuting attorney, and in criticism of defendant's counsel, should be avoided.

16. CONFLICT IN EVIDENCE: Insanity: Self-Defense: Entering Difficulty: Province of Jury. Defendant, engaged in street preaching with his wife and six others, proclaimed himself to be God, Adam God, Lord of the Vineyard, Elijah and the Fifth Angel. His children had announced the preaching for the day was over, and when a probation officer whose duty it was to look after young children in the street came to him in the mission room and began to inquire about the children, he profanely cursed him and hit him over the head with a pistol. Then calling to the others, all of whom were armed with concealed pistols, to come on, they went immediately a block away to the police station, and lined themselves up on the street, and as the policemen came out the shooting began, and two policemen and a bystander were killed. Held, that it is the province of the jury and not of the court, to determine the facts when there is a conflict in the evidence; and there being conflict in the substantial evidence on the three issues in the case, namely, defendant's insanity, whether or not he entered the difficulty with the felonious intent of committing murder, and whether or not he killed the policeman in self-defense, a demurrer to the evidence should not have been sustained.

Appeal from Jackson Criminal Court.—*Hon. Ralph S. Latshaw*, Judge.

State v. Sharp.

AFFIRMED.

A. E. Martin for appellant.

(1)   The evidence on the part of the State, as well as that introduced by the appellant, so abundantly establishes the fact that appellant could not have a fair and impartial trial in Jackson county, that it amounted to gross abuse of judicial discretion to deny the application for a change of venue.   (2) The court should not have permitted the witnesses not indorsed on the information to testify for the State, for the reason the evidence showed that the prosecuting attorney knew of these witnesses when he filed the information.   State v. Roy, 83 Mo. 268; State v. Steifel, 106 Mo. 133; State v. Stowe, 137 Mo. 525; State v. Nettles, 153 Mo. 268; State v. Barrington, 198 Mo. 81; State v. Meyers, 198 Mo. 249; State v. Griffin, 87 Mo. 608.   (3) The court erred in permitting the prosecuting attorney to question defendant about matters not gone into in examination in chief, and things not asked about nor testified to in examination in chief, that were damaging to defendant.   State v. Minor, 193 Mo. 197; State v. Bell, 212 Mo. 129; State v. Barrington, 198 Mo. 81; State v. Hathborne, 166 Mo. 229; State v. Graves, 95 Mo. 510; State v. Trott, 36 Mo. App. 29.   (4)   The court erred in admitting on behalf of the State the written statement of defendant about matters not connected with the charge of murder for which defendant was on trial and not throwing any light thereon and containing damaging statements tending to prejudice the jury against defendant in reference to guns, rifles, being in jail, and having trouble with officers in different places in the United States and in Canada.   And said statement was not proper rebuttal evidence.   Where life is at stake the court should take great care to keep out illegal testimony.   State v. Minor, 193 Mo. 597.   (5)   The court

erred in giving instruction 2 on the part of the State, on murder in the first degree, for the reason that there was no evidence upon which to base such instruction. State v. Gordon, 191 Mo. 130; State v. Garrison, 147 Mo. 39; State v. Elsey, 201 Mo. 572; State v. Walker, 196 Mo. 87. (6) The court erred in giving instruction 4, for the reason that there was no evidence upon which to base such instruction. State v. Gordon, 191 Mo. 130; State v. Garrison, 147 Mo. 39; State v. Elsey, 201 Mo. 572; State v. Walker, 196 Mo. 87. (7) The court erred in giving instruction 6, on behalf of the State, defining manslaughter in the fourth degree, in this, that said instruction authorized the jury to find the defendant guilty of manslaughter in the fourth degree, regardless of whether he intentionally shot Mullane, and in using the term "in a heat of passion" and not under such circumstances as to justify the defendant on the ground of self-defense, as defined in instruction 14, and failed to define the term "in a heat of passion," as well as referring to another instruction, supposed to define the law of self-defense, but which improperly defined the same. It is reversible error to use the term "in a heat of passion" in an instruction for manslaughter, and fail to define the same. State v. Skaggs, 159 Mo. 581; State v. Strong, 153 Mo. 555; State v. Gordon, 191 Mo. 130; State v. Reed, 154 Mo. 129; State v. Andrews, 76 Mo. 101; State v. Elsey, 201 Mo. 572. (8) The court erred in giving instruction 10 for the State, attempting to define murder in the second degree and manslaughter in the fourth degree, in this, that it told the jury that if the defendant began or provoked the difficulty in which Mullane lost his life, without any felonious purpose, and that Mullane compelled the defendant, in order to save his own life, to kill Mullane, the defendant would still be guilty of manslaughter in the fourth degree, regardless of whether or not said provo-

cation was brought about by words, or in any other manner, and failed to define the term "provoking a difficulty," nor did the instruction state that it was intentionally done. State v. Gordon, 191 Mo. 130; State v. Elsey, 201 Mo. 572. (9) The court committed reversible error in giving instruction 14, by various limitations in said instruction curtailing the right of self-defense, and particularly this part thereof: "Nor is anyone justified in using more force than is necessary to get rid of his assailant. But if he does not bring on the difficulty, or provoke it, nor voluntarily engage in it, he is not bound to flee to avoid it, but may resist with adequate and necessary force until he is safe." Neither the term "bring on the difficulty" nor "provoke it" nor "voluntarily engage in it" is defined, and that portion which states that he "may resist with adequate and necessary force until he is safe" is clearly contrary to the law which guarantees to the defendant the right to act on appearances regardless of whether or not in fact he was in imminent peril; and that portion of said instruction which states "nor is anyone justified in using more force than is necessary to get rid of his assailant," is also contrary to the law of self-defense. Under said instruction if a man brought on the difficulty or provoked it, or voluntarily engaged in it, he would have to flee from it. There was no evidence that defendant brought on the difficulty or provoked it. Consequently there was nothing to base that part of the instruction on, even if it had properly declared the law. State v. Partlow, 90 Mo. 608; State v. Edwards, 203 Mo. 540; State v. Hopper, 142 Mo. 483; State v. Gordon, 191 Mo. 130; State v. Rapp, 142 Mo. 447; State v. Garrett, 170 Mo. 397; State v. Reed, 154 Mo. 122; State v. Adler, 146 Mo. 26; State v. Venable, 117 Mo. App. 50; State v. Beaty, 190 Mo. 286; State v. Feeley, 194 Mo. 322. (10) The court committed reversible error in refusing to give defendant's instruction in the nature of a de-

murrer to the evidence, at the close of the case, for the reason that the testimony showed overwhelmingly that the defendant was insane at the time of the alleged offense, and also whatever part defendant took in the difficulty was in his own, or his wife's defense. State v. Gordon, 199 Mo. 561. (11) The court committed reversible error in giving instruction 16, on behalf of the State, in which he attempted to define insanity as a defense. Said instruction is too lengthy for ordinary jurors to comprehend, is misleading and confusing to the minds of the jurors where self-defense is also interposed; said instruction assumes that the defendant was guilty of the offense charged, and that insanity is the only defense interposed by said defendant. Said instruction contains a statement with reference to statements made by the defendant and how the jury are to regard such statements, thereby connecting insanity with the defendant's statement and confusing the jury.

*Elliott W. Major,* Attorney-General, and *Chas. G. Revelle,* Assistant Attorney-General, for the State.

(1) Defendant was in custody at all times after the information was filed, and, notwithstanding he had been previously arraigned and the case continued from one regular term to another regular term, his application wholly fails to state that the facts on which he grounds same came to his knowledge after the last preceding continuance of the case. The right to a change of venue is purely statutory, and the only way by which the same can be exercised is by a compliance with the statutory requirements. State v. Turlington, 102 Mo. 642; State v. Lanahan, 144 Mo. 31; State v. Moore, 121 Mo. 521; State v. Witherspoon, 231 Mo. 706. By reason of the inadequacy, the application was wholly insufficient and discloses upon its face a waiver of the alleged right, and this court has

so expressly held. R. S. 1909, secs. 5182-5183; State
v. Boone, 70 Mo. 649; State v. Clevenger, 156 Mo. 194;
State v. Blitz, 171 Mo. 538; State v. Witherspoon, 231
Mo. 706. Not only does the application fail to state
that this knowledge came to him after arraignment
and one regular continuance, but the evidence offered
in support thereof also fails to prove that such a con-
dition existed. It being necessary to allege such fact,
it is indispensable that it be proved. Again, the un-
timeliness of the application becomes more apparent
from the record disclosure that it was not filed on the
first but the thirty-seventh day of the term to which the
case was continued, this being the day on which the
case was set specially for trial. Thompson v. Mar-
shall, 50 Mo. App. 145; Berlin v. Thompson, 61 Mo.
App. 234. Even had the application been sufficient
and filed within proper time, this court would not be
warranted in reversing the judgment on this ground.
The evidence in favor of and against the application
was heard by the court, it having the opportunity to
observe the witnesses and judge of their credibility,
and that court having determined adversely to the
change, such ruling will not be disturbed by this court,
where, as in the present record, there is nothing to
indicate an abuse of the discretion lodged in that court.
State v. McCarver, 194 Mo. 734; State v. Vickers, 209
Mo. 12; State v. Albright, 144 Mo. 642; State v. Head-
rick, 149 Mo. 403; State v. Goddard, 146 Mo. 177. (2)
The court committed no error in permitting the State
to call and use as witnesses persons whose names were
not indorsed upon the information. Before permit-
ting such witnesses to testify the court invariably re-
quired the prosecuting attorney to show that at the
time the information was filed he did not know of such
witnesses nor their testimony, and that he did not
purposely refrain from indorsing their names thereon
in order to obtain an advantage of the appellant. State
v. Myers, 198 Mo. 246; State v. Henderson, 212 Mo.

213; State v. Barrington, 198 Mo. 23; State v. Tate, 156 Mo. 130; State v. Smith, 137 Mo. 25; R. S. 1909, sec. 5097. (3) Appellant's assignment that error was committed in the cross-examination of appellant because of alleged references to matters not touched upon during his examination in chief, cannot be reviewed, since the record shows that he preserved no exceptions whatever to such examination or the court's rulings thereon. State v. Harvey, 214 Mo. 403; State v. Barton, 142 Mo. 450; State v. Armstrong, 167 Mo. 257; State v. Bell, 212 Mo. 111; State v. Gregory, 178 Mo. 48. Even had exceptions been preserved, the complaint would be unavailing since, in point of fact, it is not well founded. While not in the same language as during his cross-examination, yet he had testified corncerning these matters in his examination in chief. The statute restricting appellant's cross-examination to matters referred to in his examination in chief does not limit the cross-examination to a mere categorical review of the matters stated by him, but he may be cross-examined as to all matters to which he directly or indirectly refers. State v. Miller, 190 Mo. 449; State v. Wertz, 191 Mo. 567; State v. Miller, 156 Mo. 76; State v. Cunningham, 154 Mo. 161; State v. McLaughlin, 149 Mo. 19.

KENNISH, P. J.—At the January term, 1909, of the criminal court of Jackson county, the prosecuting attorney filed an information charging the appellant, James Sharp, and his wife, Melissa Sharp, with the crime of murder in the first degree, for the shooting and killing of Michael P. Mullane, with a pistol, on the 8th day of December, 1908. Upon the application of the defendants a severance was granted, and the defendant James Sharp was put upon his trial, was convicted of murder in the second degree, and his punishment assessed at a term of twenty-five years in the penitentiary. He appealed to this court.

The evidence for the State tended to prove the following facts:

At the date of the homicide the defendant was the leader of a religious band of eight persons, consisting of the defendant and his wife, a widower named Pratt and his four children, three girls and one boy ranging from three to sixteen years of age, and a young man named Enghnell about twenty years of age.

The record does not disclose the religious belief of the defendant and these people, except that he preached repentance and proclaimed himself to be God, Adam, the Lord of the Vineyard, Elijah and the Fifth Angel.

About six or seven years before the homicide, while farming in Oklahoma, he claimed to have had a revelation in which he was commanded to preach the gospel. Having that end in view, he sold his farm and, with his wife and at times a few other followers, traveled over several states and into Canada, preaching and taking up collections from his hearers. While in Oklahoma City and again in Canada he had trouble with the police officers, and in the latter place he and his followers offered armed resistance to the officers of the Canadian Government.

A few days before the homicide the defendant and his band reached Kansas City in a boat, having come down the Missouri River by that means from the far north, stopping and preaching at cities and towns in the course of their journey. They lived in their boat, and when they arrived at Kansas City anchored it at the bank of the river at the foot of Main Street. They then began preaching and holding song services in the streets of the city.

All of the band except the young man Enghnell and one of the Pratt children left their house-boat on the afternoon of the 8th of December, 1908, and went up into the city to hold services. It does not appear that up to this time the police officers of Kan-

sas City had in any manner interfered with the exercises of these people, yet when they left the boat and went to the city to hold religious services on this day they were all armed with concealed fire-arms, and the defendant, in addition, was armed with a long-bladed knife.

There was a room near the City Hall and Police Station called the Workingmen's Mission, and in this place the defendant was allowed to preach. About three or four o'clock on the said afternoon the defendant's wife and the children were holding services on the street a little more than a block south of the Mission, during which time the defendant and Pratt were preaching in the Mission room to ten or fifteen men. At the close of the services on the street a collection was taken up, the children announced preaching at the Mission that night and invited the people to attend.

Mr. Holt, a probation officer, whose duty it was to look after children found on the streets and not attending the public school, arrived at the place where the services were being so held in the street, shortly before the close of the exercises, and followed the woman and the children to the Mission room. On the way he spoke to the wife of the defendant about the children. The probation officer went into the Mission room, following closely after Mrs. Sharp and the children, and found them talking with the defendant and informing him of what had been said by the officer. The officer asked the defendant if the children were his. He answered that they were and told the officer he was Adam God, the father of Jesus Christ and of the children. The officer said the children could not go out on the streets and beg. The defendant asked by what authority the officer came to talk to him as he had done, and the officer answered that it was his official duty to look after the children of the city. Thereupon the defendant became very angry and uttered vile, abusive and profane language to the officer, saying

with oaths that he would kill any blue-coated devils who would come in there and interfere with his business. The defendant then drew his revolver and pointed it at the officer, saying he would kill him. Pratt and the defendant's wife also drew their revolvers, and as the officer was leaving the room the defendant struck him on the head with his revolver and called to his followers to "come on." The officer went directly to the Police Station, about half a block south, and reported the assault. The defendant, his wife, Pratt and the children, following closely after the officer, marched down in front and to the west of the Police Station and formed a line at the curb across the street, the woman and children facing the west and the two men facing the station. The men were carrying revolvers in their hands. The children began to sing and about that time a policeman named Dalbow came from the station and advanced towards the defendant. The latter asked him if he came in peace, to which the officer replied that he did. There is much conflict in the testimony as to the occurrences immediately following. Some of the witnesses testified that the defendant and Pratt at once fired on the policeman who thus advanced, while others testified that after Dalbow shook hands with the defendant, and about that time, an officer in citizens' clothes drew his pistol on the defendant, and that the shooting was at once commenced, there being a conflict as to who fired the first shot. The defendant and all of his followers, including the woman and children, were armed and participated in the shooting. Other policemen came upon the scene, the deceased being among them, and the shooting continued for from five to eight minutes. When it ceased it was found that two policemen, one of them being Michael P. Mullane, the deceased, a bystander and Pratt, were fatally wounded. Another policeman was seriously wounded, having been stabbed in the eye and cut in the face

and neck by the defendant. During the encounter the defendant was seen shooting at police officer Mullane.

Before the fight was over the defendant, who had been wounded in both hands, went into a saloon, left his revolver with the bar-tender and offered to give himself up. He then escaped and went to a barber shop where he had his beard and hair cut. While the barber was at work he kept his wounded hands in his overcoat pockets. He made false statements in explanation of being unable to use his hands and requested the barber to take his pay from the defendant's pocket, which was done. He then went west into the State of Kansas, walked all night and remained in hiding during the next day. The next night he stopped at a farm house, still concealing his hands in his overcoat pockets. The farmer fed him and he remained there over night, left the next morning and was captured in a straw stack in the afternoon of that day. While at the farmer's house he made false statements as to his name, his family, his reason for keeping his hands in his pockets, and about other matters.

It does not appear that any of the parties whom he met and talked with while making his escape suspected that he was insane. After his capture he was returned to Kansas City were he made a written statement reciting the facts of his life and career, including the facts immediately connected with the homicide.

The defense of insanity, also self-defense, were interposed in behalf of the defendant, and a number of witnesses, including one expert, testified that in their judgment he was insane and irresponsible for his acts.

Testimony was offered by the State in rebuttal tending to show that the defendant was not insane, but that he knew and understood the moral character of his acts when he shot and killed the deceased.

The case was submitted to the jury upon instructions authorizing a conviction of murder in the first

degree, murder in the second degree, manslaughter in the fourth degree, or an acquittal upon the ground of self-defense or insanity, according as the jury might find and believe from the evidence, together with such other general instructions as were required by the evidence in the case.

I. Appellant first assigns as error the action of the court in overruling his application for a change of venue. The ground of the application was that the minds of the inhabitants of the county were so prejudiced against the defendant that he could not have a fair trial therein. .

It is contended by the Attorney-General that as the defendant was in custody at the January term of court when the information was filed, and that, as the case was continued to the April term at which the application was made, it became necessary under section 5183 (R. S. 1909) of the Change of Venue law, for the defendant to allege in his application that the facts upon which the application was based first came to his knowledge since the last preceding continuance of the case, and that failing to state such facts the application was fatally defective.

Although the application was defective, as pointed out by the Attorney-General, yet after having treated it as sufficient to raise the issue of fact as to the existence of the prejudice alleged and having introduced evidence upon such issue, the State must be held to have waived any irregularity or defect as to the form of the application. [State v. Spivey, 191 Mo. 87.]

Upon the hearing of the application the court limited the number of witnesses to fifteen on each side.

This court, in the case of State v. Barrington, 198 Mo. l. c. 85-86, stated the rule of law governing appellate courts in reviewing the action of the trial court upon an application for a change of venue, in

the following language: "It is now the well-settled rule of law in this State that the granting of a change of venue in a criminal case rests largely in the discretion of the trial court, and where the trial court has heard the evidence in favor of and against the application, and reached a conclusion adversely to granting the change, such ruling will not be disturbed by this court, and should not be, unless there are circumstances of such a nature as indicate an abuse of the discretion lodged in such court. [State v. Clevenger, 156 Mo. 190; State v. Albright, 144 Mo. 638; State v. Tatlow, 136 Mo. 678.; State v. Dyer, 139 Mo. 199.]"

We have carefully read the testimony of the witnesses upon this issue and have concluded that, although it discloses much public interest in the case and some sentiment againt the accused, yet it falls far short of showing such prejudice in the minds of the inhabitants of the county against the defendant as would warrant the court in holding that the action of the trial court in denying the application was an abuse of discretion. We think the evidence sustains the ruling of the court, and accordingly we hold the court did not err in denying the defendant's application for a change of venue.

II. Appellant contends that the court erred in permitting witnesses to testify in behalf of the State and over defendant's objection, whose names were not indorsed on the information, and whose names were known to the prosecuting attorney as witnesses at the time the information was filed.

In the case of State v. Barrington, supra, the decisions of this court and the statutes upon the subject under consideration are reviewed and rules are announced as to the rights of the defendant and of the State, and for the guidance of the court. An examination of the record upon this point has convinced us that the defendant's contention is wholly without

merit and that error was not committed by the court
in permittig the witnesses to testify over the defend-
ant's objection.

III. It is next assigned as error that the court,
over the objections of the defendant, permitted the
prosecuting attorney to cross-examine the defendant
as to matters not referred to in his examination in
chief. This assignment has been given serious consid-
eration, and has caused us to read and re-read the
examination in chief and the cross-examination of the
defendant, in order to determine whether reversible
error was committed, and if so, properly saved for
review on this appeal.

The law in this State gives to a person charged
with crime the right, at his election, to testify in his
own behalf. If he exercises this right, the law clothes
him with immunity from cross-examination as to all
matters not referred to in his examination in chief, and
a violation of that right to the defendant's prejudice
will entitle him to a new trial. [R. S. 1909, sec. 5242;
State v. Grant, 144 Mo. 56; State v. Hathhorn, 166
Mo. 229; State v. Kyle, 177 Mo. 659.]

Many objections were made by the defendant to
the scope of the cross-examination on the ground that
the questions asked were upon matters not referred
to in the examination in chief. In all except a few in-
stances the objections were sustained by the court, and
when the answer was given before the objection could
be made, it was stricken out by the court at the re-
quest of defendant's counsel.

The point is made by the State that no exceptions
were saved by the defendant to the adverse rulings of
the court as to the alleged improper cross-examination
of the defendant and that, therefore, such rulings are
not before this court for review.

That exceptions must be saved at the time of the
ruling of the court complained of, in order to be of

avail on appeal, is too well settled to require a citation of authorities. We have found upon an examination of the record, that the contention of the Attorney-. General is borne out, except in one instance in which the following occurred:

"Q. You said to Mr. Bailey in answer to a question that you said to your band to come on, 'we will hold a meeting.' Is that all you said to them?

"Mr. Martin: We object to the question.

"The Court: You asked for a part of the conversation; they have a right to all of it.

"To which ruling and action of the court the defendant did then and there at the time duly except.

"A. Let me try to get at what I said; the whole thing was so much like a blur to me. I remember telling them to come on, we will hold a meeting if they didn't kill us or something to that effect.

"Q. Did you say 'come on and bring your revolvers'? A. No, sir, they didn't have to bring them. They had them on them.

"Mr. Martin: We object to that and ask that it be stricken out.

"The Court: Overruled.

"Q. Then when you went across the street you were expecting trouble with the police?

"Mr. Martin: We object to that.

"Q. You said you would hold a meeting if they didn't kill you. You were expecting trouble with the police then?

"Mr. Martin: We object.

"The Court: Overruled.

"A. No. Does that mean looking for trouble?

"Q. Yes, sir. A. No, sir. I never was looking for trouble. When I was in Canada I wasn't looking for trouble."

The court was clearly right in overruling the defendant's objection, for the reason that the defendant had testified in chief as to what he had said to his

followers when he had called upon them to follow him from the Mission room out into the street, and therefore the cross-examination was upon a matter referred to in his examination in chief and was expressly authorized by the statute.

While we must hold that under the state of the record before us the defendant is not entitled to a reversal of the judgment and to a new trial upon this assignment of error, we cannot refrain from making a few observations before leaving this subject. The cross-examination of the defendant by the prosecuting attorney was extended and severe. Many objections were made thereto by counsel for defendant and, as before stated, were, with a few exceptions, sustained by the court. It is not always clear whether the matter upon which it is sought to cross-examine a defendant was in fact referred to in his examination in chief, and in a case in which there is a doubt as to the right of such cross-examination, the prosecuting attorney is not open to criticism when he asks the question, even though met by an objection and adverse ruling of the court; but when it is clear that the subject was not referred to by the defendant, the court should not allow the prosecuting attorney to continue a cross-examination which is violative of the letter and spirit of the statute. The harmful effect upon the jury of making many objections, even though properly made and sustained by the court, is well known to every experienced lawyer. This is especially true when the witness is the defendant on trial in a criminal case, and the court should not permit such a cross-examination as leaves the defendant the alternative of either injuring his case by continually objecting, or of answering, without objection, questions asked in violation of his plain statutory rights.

In this case the court adopted the unusual course of admonishing the prosecuting attorney of the defendant's rights when he was about to begin the cross-

examination and before a question was asked, but we have looked in vain for any admonition when the real necessity for it arose on account of improper cross-examination by the repeated asking of questions to which objections were sustained.

IV.   The defendant made a written statement, after he was apprehended, in which he gave a short review of his career for a few years preceding the homicide charged.   In this statement he referred to a conflict with the mounted police of Canada, and to an exchange of guns for small arms by himself and his followers when they returned to this country, which they could carry concealed, and which they proposed to use before they would again submit to arrest.   This statement was introduced and read in evidence by the State, and the action of the court in admitting it in evidence is now assigned as error.   The next assignment of error is upon practically the same ground, and both may be discussed together.

As to the complaint now urged against the competency of the written statement, it is sufficient to say that when it was offered in evidence by the State the court asked the defendant if he had any objection to it, to which counsel for defendant replied that he had not.   The statement was then read to the jury.   The defendant having expressly waived any objection to it, cannot now be heard to complain.

Neither did the court err in permitting the State to introduce evidence tending to prove that fire arms and weapons were in the defendant's possession at the time of the homicide.   It was entirely competent for the State to prove the purchase and possession of fire arms and weapons by the defendant, to show preparation for the commission of the crime; also to prove threats made by the defendant against the police as a class.   [State v. Rider, 95 Mo. 474; State v. Grant,

79 Mo. 113; 21 Cyc. 923; Underhill on Crim. Evidence (2 Ed.) sec. 100.]

V.    Complaint is made of error in the giving of instructions numbered 2 and 7, on behalf of the State. These instructions present to the jury the law upon the subject of murder in the first degree, and as the defendant was convicted of murder in the second degree, he is not in a position to complain of error in an instruction submitting a higher grade of crime than that of which he was convicted. [State v. Darling, 199 Mo. 168; State v. Ashcraft, 170 Mo. 409; State v. Craig, 190 Mo. 332; State v. Riddle, 179 Mo. 287.]

VI.    Instruction numbered 6 is as follows: "The court instructs the jury that if they fail to find a verdict according to the law as declared in instructions number 2 or number 4, but shall find and believe from the evidence that at the county of Jackson and State of Missouri, at any time within three years next before the 6th day of March, 1909, the defendant, James Sharp, either alone or acting in concert with another or others, did with a certain pistol shoot and kill one Michael P. Mullane, and that such shooting and killing was done in a heat of passion and not under such circumstances as to justify the defendant on the ground of self-defense as defined in instruction number 14, then you will find the defendant guilty of manslaughter in the fourth degree and assess his punishment at imprisonment in the State penitentiary for a term of two years, or by imprisonment in the county jail not less than six months nor more than twelve months, or; by a fine of not less than five hundred dollars, or by both a fine not less than one hundred dollars and imprisonment in the county jail not less than three months nor more than twelve months."

Appellant assigns error in the giving of this instruction, (1) because it authorizes a conviction of

manslaughter in the fourth degree, regardless of whether the defendant intentionally shot the deceased, and (2) because the instruction failed to define the words "heat of passion."

This instruction requires the jury to find that "the defendant, either alone or acting in concert with another or others, with a certain pistol shot and killed Michael P. Mullane," in order to warrant a verdict of guilty of manslaughter in the fourth degree, and as all of the evidence, both for the State and for the defendant, showed an intentional and not an accidental shooting and killing, the defendant could not have been prejudiced by the failure of the instruction to require an express finding that the shooting was intentional. In the recent case of State v. Sebastian, 215 Mo. 58, this court held an instruction on manslaughter in the fourth degree free from prejudicial error, although, like the instruction under consideration, it failed to require a finding that the shooting was intentional.

The second ground upon which this instruction is assailed is that it authorizes a conviction of a lower grade of homicide than murder, if the killing was done in a heat of passion, and did not define the "heat of passion" which would so reduce the grade of the crime. It is apparent that the failure to define such words, if error, was error in favor of the defendant, for it authorized a conviction of a lower grade of the crime, if committed in the heat of passion, regardless of whether such passion was caused by a lawful provocation or without any provocation whatever. The defendant was thus given the full benefit of the law of "heat of passion" as an element in lowering the grade of the offense, freed from the burden of showing that such passion was caused by lawful provocation and was the moving cause of the homicide. As the omission of a definition of these words from the

instruction was favorable to the defendant, he has no just cause for complaint.

Moreover, there was no evidence in the case tending to prove such provocation for the heat of passion as would have reduced the grade of the crime from murder to manslaughter. While there was evidence tending to prove such an assault made upon the defendant and his followers as warranted an instruction upon self-defense and justifiable homicide, there was no evidence of personal violence necessary as a basis for an instruction on manslaughter in the fourth degree upon the theory that the killing was done in the heat of passion. The authorities upon this subject are reviewed at length in the case of State v. Gartrell, 171 Mo. 489, l. c. 516, and the following statement of the law, from the case of State v. Starr, 38 Mo. l. c. 276, is approved, namely: "Neither words of reproach, how grievous soever, nor indecent provoking actions or gestures, however much calculated to excite indignation or arouse the passions, are sufficient to free the party killing from the guilt of murder. To have the effect to reduce the guilt of killing to the lower grade [manslaughter], the provocation must consist of personal violence." [Wharton's Crim. Law (9 Ed.), sec. 455.]

VII. Instructions numbered 8 and 9, given on behalf of the State, upon the question of the presumption of guilt arising from flight, are unobjectionable and are in accordance with approved precedents upon that subject. Although appellant complains of error in the giving of these instructions, he does not cite a decision of this or of any other court supporting such complaint.

VIII. Prejudicial error is complained of in the giving of instruction numbered 10. That instruction is as follows: "The court instructs the jury that if

you find and believe from the evidence in this case that the defendant voluntarily sought or invited the difficulty in which said Michael P. Mullane lost his life, with the purpose of taking advantage of the deceased and of taking his life or of doing some great bodily harm, then there is no self-defense in the case, however imminent the peril of the defendant may have become in consequence of an attack made upon him by the deceased or others acting with him, and if, in such circumstances, the jury believe from the evidence beyond a reasonable doubt that the defendant, James Sharp, either alone or in concert with others, killed the deceased, Michael P. Mullane, then you should find the defendant, James Sharp, guilty of murder in the second degree. But although the jury may believe from the evidence that the defendant began or provoked the difficulty in which said Michael P. Mullane lost his life, yet if they also believe from the evidence that this was done by the defendant without any felonious purpose and that thereupon said Michael P. Mullane and others acting with him attacked him and compelled him in order to save his own life, to take the life of the deceased, still the law, while it will not entirely justify the homicide on the ground of self-defense, will hold the defendant guilty of no higher grade of crime than that of manslaughter in the fourth degree."

The particular complaint lodged against this instruction is that it did not properly declare the law as to murder in the second degree or manslaughter in the fourth degree, if the jury should find that the defendant began or provoked the difficulty, but without a felonious purpose.

The instruction is not in harmony with the law of homicide as found in the decisions of this court, but not because it states the law unfavorably to the defendant. By this instruction the jury was told that if the defendant voluntarily sought or invited the difficulty, with the felonious purpose of taking the life

of the deceased or of doing him some great bodily harm, and thereupon took the life of the deceased under the facts stated in the first part of the instruction, the jury should find him guilty of murder in the second degree. Under the settled law of homicide, if the defendant killed the deceased, after having voluntarily sought or invited the difficulty with the felonious purpose of killing or of doing him some great bodily harm, the crime is murder of the first and not of the second degree. [State v. Gilmore, 95 Mo. 554; State v. Cable, 117 Mo. 380; State v. Gamble, 119 Mo. 427.] This principle of the law of homicide was given expression by this court in the Gilmore Case, supra, in the following language: ''It is not true, as asserted in this instruction, that there is no self-defense in a case where a defendant begins a quarrel or voluntarily enters into the same. It is only true where he does so with the view to take advantage of the quarrel thus begun and to slay his adversary, or do him some great bodily harm. Whenever this is his purpose, he loses his right of self-defense, and if forced to slay his adversary, even though to save his own life, his act becomes murder in the first degree and nothing less.''

We have not overlooked the fact that this court in the case of State v. Talmage, 107 Mo. 543, approved an instruction which, in practically the same language and predicated upon the same facts as instruction numbered 10 in this case, authorized a conviction of murder in the second degree. But in that case, with the permission of the court, the prosecuting attorney had elected to prosecute for murder in the second degree, so that although the facts upon which the instruction was based would have warranted a conviction of murder in the first degree, the court was precluded from submitting the question to the jury upon a higher grade of offense than that for which the defendant was on trial.

The second part of the instruction was also too favorable to the defendant, because there is no evidence in the case tending to prove that the defendant began or provoked the difficulty with a purpose unlawful but not felonious. It is shown by the evidence that after the defendant had assaulted officer Holt in the Mission room, he and his followers immediately went down in front of the Police Station, armed with deadly weapons, which they used with deadly effect when occasion arose, and it is too plain for argument that if the defendant, or those with him, provoked the difficulty at all, it was with the felonious purpose which they promptly proceeded to carry out as soon as the difficulty began.

For the foregoing reasons, we hold that prejudicial error was not committed in the giving of instruction numbered 10.

IX. Instruction numbered 14, given on behalf of the State, submitted to the jury the law upon self-defense and manslaughter in the fourth degree. Numerous alleged errors in this instruction are complained of. In disposing of this assignment it is sufficient to say that while the instruction in some respects was not applicable to the facts of the case, it was a correct expression of the law as approved by this court in the following cases, and was as favorable as the defendant was entitled to: State v. Thomas, 78 Mo. 341; State v. Hicks, 92 Mo. 431; State v. Talmage, 107 Mo. 557.

X. Instruction numbered 16 was given by the court, on behalf of the State, upon the defense of insanity, and it is contended by appellant that this instruction is erroneous for the reason that "it is too lengthy for ordinary jurors to comprehend, and is misleading and confusing to the minds of the jurors where there is also the defense of self-defense interposed." We are inclined to agree with appellant that

an instruction on insanity is not entirely clear to the ordinary understanding, but it is doubtless because of the inherent difficulty of presenting the subject to the jury, in all of its bearings, upon the issues and under the evidence in the case. However this may be, as the instruction complained of is in accordance with the decisions of this court, we must hold it free from error. [State v. Pagels, 92 Mo. 300; State v. Duestrow, 137 Mo. 71; State v. Holloway, 156 Mo. 222; State v. Schaefer, 116 Mo. 96.]

XI. The defendant requested the court to give a number of instructions which the court refused, and error is now assigned in such action of the court. We have examined the refused instructions, and have compared them with those given by the court upon the request of the State and of the defendant, and we think the questions of law arising upon the evidence and necessary for the information of the jury, were fully covered by the instructions given. And it is well settled that when a proper instruction is given, it is not error to refuse another upon the same subject, even though the instruction asked and refused be a correct statement of the law. [State v. Franke, 159 Mo. 535; State v. Nelson, 166 Mo. 191; State v. Bradford, 156 Mo. 91.]

XII. It is earnestly insisted by appellant that during the course of the trial remarks were made by the court which were so highly prejudicial to the defendant as to constitute reversible error and entitle him to a new trial. A number of these remarks of which complaint is made are set out in appellant's brief, and while we do not consider them of such serious import as to amount to reversible error, some of them are subject to criticism. What the court said in the hearing of the jury complimentary of the prosecuting attorney, and at another time in criticism of the

attorney for the defendant, may or may not have been deserved, but as it cannot be said that a manifestation by the court of its good opinion of one attorney and of hostility to another is without influence on the minds of the jury, and as the defendant was on trial for his life, the remarks should have been avoided.

XIII.  It is finally insisted that the court erred in refusing defendant's instruction in the nature of a demurrer to the evidence.  In support of this contention it is argued with much earnestness that the testimony fully established the defense of insanity, and that as the part which the defendant took in the encounter was in defense of his own life and that of his wife, the court should have directed a verdict of acquittal.

There was no evidence in the case tending to prove that the defendant, or those acting with him, shot and killed the deceased in the necessary defense of the defendant's wife, and the court properly omitted giving an instruction to the jury presenting that phase of the case.  It is shown by the evidence that although the defendant was the leader of the band which he had armed and instructed in the use of the weapons, he was the first to make his escape from the bloody conflict which he had precipitated, leaving his wife and his followers to their fate, while he seemed concerned only in his own safety.

Whether the defendant and those acting with him, or the officers, were the aggressors in the fight, was an issue upon which there was a conflict in the testimony and, therefore, it was a question for the consideration of the jury.  If the defendant invited or brought on the difficulty with the felonious purpose of taking the life of the officers or of doing them some great bodily harm, he was guilty of murder in the first degree, regardless of who fired the first shot.  Upon this point, in view of the zeal with which it is urged by the appellant that the character of the defendant's mission

and conduct was unoffending and peaceable until it became necessary for him to act in self-defense, a brief review of the facts in evidence is made necessary.

The defendant, according to his own statement, had been in frequent trouble with police officers before arriving in Kansas City and had procured weapons for the avowed purpose of preventing the police from interfering with him or his followers in their preaching and religious services. It does not appear that they had ever been in Kansas City until they came in their boat a few days before the day of the homicides. After arriving at this city they began holding services on the streets, and were also given the use of a mission room for that purpose. Until the 8th day of December, 1909, the day of the alleged offense, there is no testimony tending to prove any interference whatever by the police officers of Kansas City with the preaching or services of these people. And, although they had no cause for anticipating trouble with the police, we find them on that day leaving their houseboat and going up into the city heavily armed with concealed weapons, even to the women and children. As they had not been molested by the police officers of Kansas City up to this time, why all this preparation for bloodshed? The probation officer, whose duty it was to look after children found upon the streets, went into the mission in the discharge of his duty. The defendant, in a rage of anger, and with profane and violent language, pointed a pistol at the officer and threatened to kill him, and did strike and wound him on the head with the pistol. At this juncture a most significant fact, throwing light upon the motive and purpose of the defendant, is worthy of note. The children, in closing the exercises on the streets but a few minutes before, had invited the people to come to the mission to hear the preaching that night, and it is evident that no more street services for that day were contemplated, yet, when the officer was sent bleeding

from the mission room to the Police Station, the defendant, "filled with vengeance," as expressed by him, immediately called to his followers to "come on," and, carrying arms in their hands, they went down the street directly in front of the Police Station, although no reason appears why they could not as well have held their street services anywhere else. The defendant and Pratt faced the station and the shooting began when the officers came upon the scene, as heretofore stated. Such conduct on the part of the defendant clearly tends to prove that he went out of the mission room and down in front of the station for the purpose of inviting and provoking the difficulty, and the concert of action among the defendant and his followers showed further that they had a common understanding and were prepared for the deadly work which quickly ensued. If the defendant did so provoke the difficulty and thereafter killed the deceased, as detailed in the instructions and as indicated by the foregoing facts, he was guilty of murder in the first degree, unless he was insane and not responsible for his acts.

The question remains to be considered: Was the defendant insane? It is shown by the testimony that the defendant engaged in many acts and did many things which would have been regarded as unusual and irrational in a person of sound mind, both when a boy and after he had reached manhood. There was also the direct evidence of several witnesses tending to prove that he was insane. On the other hand it is shown that for many years he followed gambling for a livelihood, and there is no evidence that he was lacking in mental balance during that period of his life. He had never taken kindly to work and it was to be expected that life on a homestead in Oklahoma would not be to his liking. As to his preaching, aside from his conduct in Oklahoma City, and the high-sounding names of characters he assumed to impersonate, there is very

little to indicate insanity. Indeed, a careful study of his life, as disclosed by the record, tends strongly to the conclusion that there was method in his madness in assuming the character of these high personalities which, with an air of authority, he proclaimed himself to be. One who desires distinction or notoriety and lacks the ability to command it, may always have resort to that end through the cheaper avenue of sensationalism. Announcing himself under these names, the defendant could readily attract attention and hearers; without that he would have been unnoticed. Be that as it may, it remains that he traveled over the country with his followers, making his way for five or six years. And when he saw and realized the consequences of his crime on the day of the homicide, like any person of sound mind under similar circumstances, he was fully conscious of his guilt and sought refuge in flight. In his travels of two days, although he had met several persons, including a barber whom he had trim his hair and beard as a disguise, and a farmer with whom he stayed over night, he was able to deceive them with false statements, and it is not disclosed that any of these persons with whom he came in contact during his flight suspected him of insanity. In addition to the foregoing facts and circumstances, there was direct evidence on the part of the State tending to prove that the defendant was not insane. We think the evidence as to his sanity and responsibility for his acts was ample to sustain the verdict of the jury.

There was substantial evidence tending to prove that the defendant and those acting with him were the aggressors in the encounter, and that they invited and provoked the difficulty in which the deceased lost his life; also that the defendant fired the fatal shots. It is the province of the jury, and not of the court, to determine the facts when there is a conflict in the testimony, and where there is substantial evidence to war-

rant the finding of the jury, this court will not disturb the verdict.

For the reasons stated, we hold that the court did not err in refusing the instruction in the nature of a demurrer to the evidence. [State v. Richmond, 186 Mo. 71; State v. Smith, 190 Mo. 706; State v. Sassaman, 214 Mo. 695.]

As reversible error is not shown in the record, the judgment should be affirmed. It is so ordered. *Ferriss* and *Brown, JJ.,* concur.