## THE STATE v. CLYDE W. GOW, Appellant.

### Division Two, June 20, 1911.

1. **ACCESSORY: Abortion: Sufficient Information.** Under the statute (Sec. 4898, R. S. 1909) an accessory before the fact may properly be charged as though he alone committed the criminal act, and without setting forth in the charge the name of the principal. And this rule is applicable to a charge of one who is an accessory to an abortion. Though the theory of the State be that an unnamed physician was the principal in the abortion, and that defendant, who is not a physician, was an accessory before the fact; and though the information charge that defendant did "use and employ" upon the woman the instrument described, which was used, if used at all, by the physician; and though the information charge that defendant did "advise, cause and procure" the doing of the criminal act, without naming the physician, yet under an information charging defendant directly with doing the acts which by the statute (Sec. 4458, R. S. 1909) are made to constitute the offense declared by it to be "manslaughter in the second degree," the defendant may be convicted as an accessory by proof that he advised, caused and employed a physician to produce the abortion which resulted in the woman's death.

2. **Sufficiency of Proof.** A charge and conviction of an accessory may be sustained upon facts which would be insufficient if the accused was proceeded against as principal for the same offense.

3. **Abortion: On Advice of Physician.** Where the prosecution is against the physician who committed the act of abortion that resulted in the woman's death, it is not necessary to charge or prove that he did not act upon the advice of a physician. Therefore, it is not necessary to charge or prove such fact against an accessory before the fact to a principal who was a physician.

4. **VENUE: Proof.** Proof of the venue of the crime charged is necessary to sustain a conviction; but direct evidence that it was committed in the county is not required. It is sufficient if that fact can be reasonably inferred from the facts and circumstances in evidence.

5. **DYING DECLARATION: Competency for Court: Attendant Facts.** The competency of a dying declaration is a question of law for the determination of the court; but all the facts and circumstances in connection with it are competent evidence to enable the jury to determine the weight and probative force to which it is entitled.

6. **Facts Constituting Admissibility.** The State showed that the young woman went to the physician's office Thursday morning; that she returned to her mother's home in about two hours in a sick and nervous condition; that on Friday evening she was very sick and had a burning fever; Saturday her condition did not improve, and her cheeks began to flush; she continued to grow worse, and on Sunday night her cheeks were a dark purple; on Monday morning about three o'clock her mother went to her room to relieve her sister who had attended her that far during the night; the mother testified that declarant was then "as bad as she could be to be alive;" as soon as they were alone, declarant said to her, "Ma, I am going to die and I have something awful to tell you." She then went on to say defendant "deceived me" and procured the physician to produce an abortion upon her, and closed by saying, "Ma, you don't know what it cost me to tell you this, but I couldn't die and meet my God face to face with this awful stain on my soul." The mother testified she requested her to tell no one what she had revealed to her *until* she died; and there was much testimony that, at the coroner's inquest and to other persons, declarant had requested her to tell no one *unless* she died. Defendant died Tuesday afternoon. *Held*, that the court did not commit error in permitting the mother to detail what declarant said to her on Monday morning.

7. ———: ———: **Contradictory Statements.** And whether the mother used exactly the same words each time she undertook to recite declarant's words is not of any great importance in determining the competency of the declaration. Declarant's clear-

State v. Gow.

ness of mind, her dying condition, her statement of her belief in impending death and the circumstances under which she made her disclosures, met the requirements of the law.

8. INSTRUCTION: Covered by Others Given. The court does not commit error in refusing an instruction asked by defendant, if another which is unobjectionable is given upon the same subject.

9. CONSPIRACY: Declarations of Conspirator After Fact: Abortion: Testimony of the acts done and declarations made by the physician, the principal, after the abortion and before the death of the young woman, is admissible in evidence against his accessory, and is not to be excluded on the theory that the conspiracy ended with the abortion.

10. ———: Abortion: Demurrer to Evidence: Waiver. Where defendant did not stand upon his demurrer to the evidence offered at the close of the State's case, but offered testimony in his defense, he waived his right to have the court determine that upon the State's evidence alone a verdict of guilty cannot stand.

11. ———: ———: Sufficiency. The evidence in this case is set out in the statement, and reviewed in the opinion, and held sufficient to sustain a verdict convicting the defendant, an unmarried minister thirty-eight years old, of procuring a physician to commit an abortion on an unmarried female school teacher, aged twenty-two.

Appeal from Audrain Circuit Court.—*Hon. James D. Barnett,* Judge.

AFFIRMED.

*R. H. Norton, Dudley & Palmer, Avery, Young & Woolfolk* for appellant.

(1) The court in the information on which defendant was tried, charged the defendant at the county of Lincoln on the 20th day of February, 1908, with making an assault upon one Lizzie Gleason and did use and employ a certain instrument . . . . and did thrust and force said instrument and advise, cause and force the said instrument to be inserted, thrust and forced into the body, womb and private parts of the said Lizzie Gleason . . . . from the effects of

which she died on the 25th day of February, 1908. The court at the trial, under this charge, permitted evidence to be given that the defendant advised and procured one Dr. W. A. Hemphill to perform an abortion on the deceased Lizzie and in this, we think the court erred. Sec. 22, Art. 2, Constitution of Missouri; Chitty, Cr. Law, 169; State v. Murphy, 141 Mo. 270; State v. Hayward, 83 Mo. 304; State v. Fraker, 148 Mo. 143; State v. Barbee, 136 Mo. 440; State v. Kruger, 134 Mo. 262; State v. Stowe, 132 Mo. 199; State v. Nunley, 185 Mo. 102; State v. Thierauf, 167 Mo. 429; State v. Burke, 151 Mo. 136; State v. Metsenberger, 171 Mo. 601; State v. Cameron, 117 Mo. 371. (2) The defendant asked and the court refused to give an instruction to the effect that Dr. W. A. Hemphill was a licensed physician at the time of the alleged operation and also to the effect that even though an operation was performed on Lizzie by Dr. Hemphill, but not on the advice of Clyde Gow, then defendant was entitled to acquittal. State ex rel. v. Goodier, 195 Mo. 551; State v. Mathews, 20 Mo. 55; State v. Reed, 154 Mo. 122; State v. Davis, 141 Mo. 522. (3) The court erred in admitting any evidence as to the alleged dying declaration of deceased Lizzie Gleason. State v. Horn, 204 Mo. 546; State v. Parker, 172 Mo. 194; State v. Draper, 65 Mo. 340; State v. Vansant, 80 Mo. 76; State v. Parker, 96 Mo. 392; State v. Bowles, 146 Mo. 16; State v. Kelleher, 201 Mo. 636; State v. Zorn, 202 Mo. 31; State v. Simon, 50 Mo. 372; State v. Johnson, 118 Mo. 504; State v. Kelleher, 201 Mo. 638; State v. Draper, 65 Mo. 335; State v. Johnson, 118 Mo. 491. (4) There was no conspiracy proven by the evidence in this case. State v. Kennedy, 177 Mo. 102; Weinstein v. Reed, 25 Mo. App. 41; State v. Reed, 85 Mo. 198; State v. Duncan, 64 Mo. 266; Spies v. People, 3 Am. St. Rep. 449; Metcalf v. Conner, 12 Am. Dec. 341. (5) The court should have sustained the demurrers offered both at the close of the State's

evidence and at the close of all the testimony given in the case. Authorities above cited. (6) The State did not prove the venue or that the alleged offense was committed in Lincoln county, Missouri. (7) Nor did the State prove that the alleged operation was unnecessary to save life. State v. Meek, 70 Mo. 358. (8) The offense, if any, committed by the defendant was that an abortion being committed on the deceased, and the offense so far as he was concerned, was completed upon the commission of the abortion and her death occurring several days after could be no part of the offense, and therefore any statement of a co-conspirator after the completion of the offense, that of abortion, could not be given in evidence against the defendant. Cone v. Horner, 153 Mass. 343; Reuting v. Korn, 110 Pa. 1; State v. Bean, 85 Mo. App. 473. (9) The particular statute must be proceeded under to the exclusion of the general statute. State v. Green, 87 Mo. 587; State ex rel. v. Foster, 187 Mo. 610; State v. De Bar, 58 Mo. 395.

*Elliott W. Major*, Attorney-General, and *James T. Blair*, Assistant Attorney-General, for the State.

Appellant concedes, in effect, that in so far as the information sought to charge that appellant did, himself, "insert, thrust and force said instrument," by which the abortion was procured, it is not subject to attack. It is insisted, however, that in so far as it sought to charge that appellant advised the procurement of the abortion, the information is invalid. The information follows closely the language of the statute. Sec. 4458, R. S. 1909. The contentions made by appellant's counsel resolve themselves into these: First— The information does not charge that appellant was *not* a duly licensed physician. Second—The information does not name the person whom appellant "advised." 1. Under section 4458, R. S. 1899, under

which section the information in this case was framed,
it is not necessary to charge that the defendant is not
a duly licensed physician.    It is to be observed that
the information does charge that the procurement of
the abortion was not "necessary to preserve the life
of the said Lizzie Gleason and not  . . . .  neces-
sary to preserve the life of an unborn child then in the
womb of the said Lizzie Gleason."    It further charges
that the abortion had not "been advised by a duly
licensed physician to be necessary for the purpose of
preserving the life of an unborn child then in the
womb of the said Lizzie Gleason."    The portion of
the statute upon which the charges mentioned and
the contention of appellant are based, is a general ex-
ception applicable to all cases where the act was neces-
sary to save the life of the woman or the child.    From
the provisions of the statute, still rigorous despite the
general exception first made (Hatchard v. State, 79
Wis. 362), a person who is *not* a licensed physician
is further absolved if he acted under the advice of a
physician.    In fact, there are but two possible defenses
under this clause, i. e., that the act was necessary
(this being a defense for all) and that the act was ad-
vised by a physician (this defense being restricted to
those who are not physicians).    The information nega-
tives both the general defense or exception and also
negatives the additional defense open to those who are
not licensed physicians.    The phrase "or if such person
is not a duly licensed physician," is not an additional
exception in itself, but merely a parenthetical phrase,
descriptive of those who might avail themselves of the
second exception. A physician could defend only under
the first exception.    Any other could defend under
either exception.    State v. Fitzporter, 93 Mo. 394.
Both exceptions are negatived by the information on
which appellant was tried.    The case of State
v. Meek, 70 Mo. 357, is cited on this point.    The in-

formation in the case at bar meets, exactly, the requirements of the rule laid down in that case.    In that case there was a total failure to negative the fact that the defendant acted on the advice of a physician. Here that fact is negatived.    The information negativing any necessity for the operation and negativing the performance of the operation under the advice of a physician, negatives both the exceptions in the clause, thus negativing all the defenses open to appellant whether he be physician or layman.    There would be no additional virtue imparted to the information by including a clause informing him that he was not a licensed physician. Whether licensed physician or not, the information so negatives the exceptions as to show (waiving other objections for the moment) that if the facts charged be true appellant is necessarily guilty.    This is the sole purpose of negativing exceptions in any case—that the information may state a prima-facie case.    1 Bishop's New Crim. Proc., sec. 636.    Where the statute makes the advice of physicians a defense, the fact that the offender is a physician does not aid him if the operation was, in fact, unnecessary. Hatchard v. State, 79 Wis. 362. 2. So far as we have been able to discover, no case requires the information to name the person advised where the offense alleged is the advising of the procurement of an abortion.    But the answer to the second criticism made of the information in appellant's brief is that appellant is charged as a principal, as was proper. Sec. 4898, R. S. 1903; Sec. 5105, R. S. 1909; State v. Steptoe, 65 Mo. 642; State v. Orrick, 106 Mo. 119; State v. Sykes, 191 Mo. 79; Bishop's New Cr. Law, secs. 604, 664, 670, 673, 653.    3. Under these authorities and statutory provisions, the information easily meets the criticisms lodged against it.    Certainly, it was not objectionable to charge conjunctively the several acts which the statute, disjunctively, denounces as crimes.    State v. Currier and Moore, 225 Mo. 649. Further, "a portion of an indict-

ment may be stricken out, or be treated as surplusage, if enough be left to make a valid and substantial charge of the crime intended to be charged.'' State v. Currier and Moore, 225 Mo. 658.

KENNISH, P. J.—At the January term, 1909, of the circuit court of Audrain county, appellant was convicted of manslaughter in the second degree, sentenced to imprisonment in the penitentiary for a term of four years, and appealed to this court.

The original information, which contained three counts, was filed in the circuit court of Lincoln county on March 20, 1908. Two amended informations were filed, each containing three counts. After the defendant had entered a plea of not guilty to the second amended information, he applied for and was granted a change of venue to the circuit court of Audrain county. The case was tried in the Audrain Circuit Court at the January term, 1909. The State dismissed as to the first and third counts, the defendant was again arraigned, entered a plea of not guilty to the second count of the second amended information, was placed on trial, found guilty, and his punishment assessed as stated.

The count of the information upon which the defendant was convicted is as follows:

"And the said Brevator J. Greech, prosecuting attorney within and for the county of Lincoln, in the State of Missouri, acting herein under his oath of office and on his knowledge, information and belief, gives the court to further understand and be informed that Clyde Gow on the 20th day of February, A. D. 1908, at the county of Lincoln, in the State of Missouri, in and upon the body of a certain woman, to-wit, one Lizzie Gleason, did then and there willfully, unlawfully and feloniously make an assault, and did then and there willfully, unlawfully and feloniously use and employ and advise and cause and procure to be used and em-

ployed in and upon the body, womb and private parts of the said Lizzie Gleason, a certain instrument, the exact nature and description of which instrument is to this informant unknown, and did then and there willfully, unlawfully and feloniously insert, thrust and force the said instrument, and advise, cause and procure the said instrument to be inserted, thrust and forced into the body, womb and private parts of the said Lizzie Gleason, with the willful, unlawful and felonious intent then and there to procure and promote the miscarriage and abortion of the said Lizzie Gleason, the same not being necessary to preserve the life of the said Lizzie Gleason, and not being necessary to preserve the life of an unborn child then in the womb of the said Lizzie Gleason, and not being advised by a duly licensed physician to be necessary for the purpose of preserving the life of the said Lizzie Gleason, and not being advised by a duly licensed physician to be necessary for the purpose of preserving the life of an unborn child then in the womb of the said Lizzie Gleason, thereby then and there willfully, unlawfully and feloniously inflicting in and upon the body of the said Lizzie Gleason and in and about the womb and other internal parts of the said Lizzie Gleason certain mortal wounds and lacerations and creating in the said Lizzie Gleason a mortal sickness, disease and feebleness of body, of which mortal wounds, lacerations, disease and feebleness of the body, she, the said Lizzie Gleason, did languish and languishing did live from the 20th day of February, A. D. 1908, until the 25th day of February, A. D. 1908, on which said 25th day of February, A. D. 1908, the said Lizzie Gleason, at the county of Lincoln, in the State of Missouri, by means and in consequence of the willful, unlawful and felonious use and employment of the said instrument as aforesaid, and of the mortal wounds, lacerations, sickness, disease and feebleness of body produced and inflicted by the

use and employment of the said instrument as afore-
said, did then and there die.

"And so the said Bevator J. Creech, prosecuting
attorney, as aforesaid, upon his oath of office afore-
said, does say that the said Clyde Gow, by the means
and in the manner and form aforesaid, the said Lizzie
Gleason, willfully, unlawfully and feloniously did kill
and murder contrary to the form of the statute in
such case made and provided, and against the peace
and dignity of the State."

The evidence for the State tended to show the fol-
lowing facts: From the fall of 1906 until the latter
part of February, 1909, the defendant, an unmarried
man, thirty-eight years of age, was pastor of two
churches in Lincoln county, one located in Elsberry
and the other a country church known as Smith's Chap-
el, located several miles north of Elsberry.

In the winter of 1907 and 1908, Lizzie Gleason,
twenty-two years of age, taught a country school
about eight miles north of Elsberry. During that
winter she boarded at the home of B. F. Greene, which
was near her school and Smith's Chapel, but usually
went to her mother's home in Elsberry on Friday or
Saturday and remained until Monday morning.

During the fall and winter of 1907 and 1908 the
defendant showed Miss Gleason some attention, ac-
companied her to and from church several times, drove
her to and fro between Elsberry and her school three
or four times, visited the home of Greene where she
was boarding, visited her school, met and engaged her
in conversation frequently on the streets and in the
stores of Elsberry.

In the latter part of January, 1908, the young
woman became sick, exhibited symptoms of pregnancy,
and in February gave up her school and returned to
the home of her mother in Elsberry. On Thursday,
February 20, 1908, she went down town from her
mother's home in Elsberry and returned in about two

hours in a very nervous condition. According to her mother's testimony she "seemed like anybody with a very hard chill." She took to her bed on the same day, and on Friday evening became violently ill. Saturday she grew worse and had Dr. Hemphill, a physician of Elsberry, called to attend her, requesting that he be called instead of Dr. Bailey, the family physician. Dr. Hemphill made several visits, but the condition of the young woman grew rapidly worse. Sunday night her sister remained with her and waited on her until about three o'clock Monday morning. At that hour her mother came to the sick room to care for her during the remainder of the night. After the sister left the room she said to her mother: "Ma, I am going to die and I have got something awful to tell you." She then stated that Clyde Gow had "deceived her;" that he got her to go to Dr. Hemphill to have an operation performed; that Dr. Hemphill performed the operation on Thursday, February 20th; that "he took the child away and they killed it;" that when she promised the defendant she would go to Dr. Hemphill and have the operation performed he told her if she didn't get along under Hemphill's care she should have one of the best physicians in St. Louis to pull her through. She then requested her mother to tell no one what she had revealed until she died and said she didn't care what her mother did then. The mother stated to her that she couldn't bear it alone and would tell Frank, her brother. She thereupon threatened to immediately kill herself by taking carbolic acid from a bottle that was then in the room unless her mother promised to tell no one.

Dr. Hemphill was then sent for and arrived in about an hour. He first assured the mother that her daughter was "getting along fine" and would be up in a few days. He said he would admit that he "gave her too much calomel, not knowing she had missed her monthlies, and the treatment for her bowels

brought it all on at once and left her in a weakened condition." There was then a short conversation between Dr. Hemphill and the young woman, which the mother did not hear, when Dr. Hemphill said to the mother: "Look here, Mrs. Gleason, there don't anybody know this but us four, and if you are a true mother you will keep it; you know human nature is weak and will fall, and I did that for her, aiming to put her back in the proper position she once held." Dr. Hemphill made several visits afterwards and on the following day Dr. Bailey, the family physician, was called. Miss Gleason stated to Dr. Bailey, in the presence of Dr. Hemphill, that the latter had operated on her, "dilating the cervix," whereupon Dr. Hemphill said to the girl: "Didn't you promise me you would never tell this to anyone, you would die first?" She said, "Yes, but I couldn't keep it." The efforts of the two physicians to save the young woman's life were futile and she died in the afternoon of February 25th.

A post-mortem examination of the body was made. There was evidence tending to show that death resulted from peritonitis, superinduced by the procurement of an abortion, as well as evidence that the post-mortem examination did not disclose any symptoms of an abortion.

During the evening of the day Miss Gleason died, two members of the defendant's church called at his home to see him. When they knocked at the door defendant asked if Dr. Hemphill was there. Upon being told who his visitors were he invited them in. They went inside and one of them said: "Brother Gow, there is a sensation in town; you are implicated or accused in this case. Miss Lizzie Gleason is dead and you are accused." The defendant immediately declared he was innocent. In the conversation that followed he said: "I might be brought into this case in this wise: I took her to and from school and church

several times. During one or whether more of these rides, I disremember, she said to me that she was in trouble. At first I thought possibly it was over some youngster, some love affair. It impressed me further that possibly the nature of the trouble was different. She says, 'I have no father to go to and I come to you as a friend,' is my recollection. I then said, 'Go to your mother.' She said, 'I can't go to my mother.' I said, 'Go your family physician, Dr. Bailey.' She said, 'I can't go to Dr. Bailey.' I said, 'Then go to Dr. Powell.' She said, 'I can't go to Dr. Powell.' I said, 'Then go to Dr. Hemphill.' "

The three then went to the residence of Dr. Hemphill, but failed to find him at home. One of the men then suggested to defendant that by reason of the excitement in the town it would be best for him to go to the home of Mr. Welch at the edge of town and spend the night, and defendant did go there and spend the night. The next afternoon the defendant sent for a brother minister, Mr. Reavis, to come to see him at Dr. Hemphill's. Mr. Reavis went to Hemphill's and found the defendant there weeping. He protested his innocence. In the conversation that followed he said: "She spoke to me about having some throat trouble, and said she was blue about the matter, and asked me concerning the physicians, as to Dr. Hemphill being an osteopath, and I told her he was an osteopath, practiced osteopathy, and she asked how he was by other osteopaths. I said, 'I don't know about that; possibly as good as any.' " In the same conversation the defendant stated that he had told Dr. Hemphill that the girl was coming to him for treatment for her throat.

That evening the defendant went to the home of Mr. Magee, some distance in the country, and that night the constable arrested him at the Magee home. Officer and prisoner remained at Magee's during the night. The next morning as they were preparing to

leave, Magee asked the defendant if he sent Lizzie Gleason to Dr. Hemphill for treatment and defendant replied that he did. Asked if he told Dr. Hemphill to treat her, he replied ''I told him to treat her and do what he could for her. That I suspected that something was wrong with her, and if there was I would be accused of it.''

The defendant at this time was very nervous and seemed to fear mob violence. He requested the constable to take him to Troy instead of Elsberry. The constable had received a telephone message that morning that it would not be best to take the defendant to Elsberry on account of the excitement over the tragedy and, upon this advice and at the request of the defendant, the officer took him to Troy.

The evidence for the defendant tended to show the following facts:

At the coroner's inquest, held over the body of Lizzie Gleason, the mother, Mrs. Sarah Gleason, testified that when her daughter made the dying statement she said the information was not to be imparted to any one *unless* she died, and if she died she didn't care what her mother did with it. This was shown by two members of the coroner's jury and by a newspaper man who heard the testimony and made notes of it.

On the evening of her daughter's death Mrs. Gleason said to a neighbor woman who was at her house that her daughter had required of her that she should not reveal the dying statement if she lived, but if she died then she didn't care. In this conversation Mrs. Gleason further stated that her daughter had said the defendant was the author of her trouble, and that he was with her only once and that was on December 18, 1907. Defendant was not with Lizzie Gleason on that date. On the day following the death, Mrs. Gleason said to another neighbor woman that Lizzie had confided a secret to her about her

condition and had made her promise that if she lived she wouldn't tell it, but said if she died she didn't care what her mother did with it. In this conversation Mrs. Gleason again stated that her daughter told her that she had had intercourse with the defendant but once and that was on the 18th of December.

Several medical witnesses testified that Lizzie Gleason's death was due to peritonitis and that the female organs showed no indications of there having been an abortion or that she had been pregnant. There was also testimony tending to show that she died of appendicitis.

The testimony given by Mrs. Gleason was also shown to be inconsistent with her former statements concerning details of less importance.

The defendant testified in his own behalf, giving the full details of his early life and struggles to obtain an education and of his work in different places as a school teacher and as a minister of the Gospel. He denied that there had ever been any improper relations between him and Lizzie Gleason. Denied *in toto* the conversation testified to by Magee. His denial of this conversation is supported by the testimony of the constable, who testified that no conversation was had between defendant and Magee at the time and place stated by Magee.

The defendant further testified that he had been in the Gleason home but one time, and then for only a few minutes. His testimony on this point was not contradicted. He also testified fully as to each time he had been in the company of Miss Gleason, which does not differ materially from the testimony for the State on that point.

Twenty-one witnesses testified to the good reputation of the defendant in different localities in the State where he had resided.

The certificate issued to Dr. Hemphill, authorizing

him to practice medicine, was also introduced in evidence by the defendant.

The foregoing is deemed a sufficient statement of the facts disclosed at the trial to afford an understanding of the questions presented to this court for review, except such parts of the evidence as will be referred to later.

I.   The sufficiency of the second count of the information, on which the defendant was convicted, is challenged on the ground that it failed to inform the defendant of the nature and cause of the accusation against him.

That part of the statute (Sec. 4458, R. S. 1909) upon which the prosecution was based and necessary to an understanding of the question under consideration, is as follows:

"Any person who, with intent to produce or promote a miscarriage or abortion, advises, gives, sells or administers to a woman (whether actually pregnant or not), or who, with such intent, procures or causes her to take, any drug, medicine or article or uses upon her, or advises to or for her the use of, any instrument or other method or device to produce a miscarriage or abortion (unless the same is necessary to preserve her life or that of an unborn child, or if such person is not a duly licensed physician, unless the said act has been advised by a duly licensed physician to be necessary for such a purpose), shall, in event of the death of said woman, or any quick child, whereof she may be pregnant, being thereby occasioned, upon conviction be adjudged guilty of manslaughter in the second degree, and punished accordingly."

It will be observed that the information, which is set forth in the statement accompanying this opinion, charges the defendant directly with the doing of the acts constituting the offense, and also charges that he advised, caused and procured the doing of

such acts. It is provided by section 4898, Revised Statutes 1909, that an accessory before the fact to any murder or other felony, "shall, upon conviction, be adjudged guilty of the offense in the same degree, and may be charged, tried, convicted and punished in the same manner, as the principal in the first degree." Under this rule of criminal procedure it is well settled that an accessory before the fact may properly be charged as though he alone committed the criminal act and without setting forth in the charge the name of the principal. [State v. Rucker, 93 Mo. 88; State v. Schuchmann, 133 Mo. 111; State v. Edgen, 181 Mo. 582; 1 Bishop's New Crim. Proc. (2 Ed.), sec. 332; 22 Cyc. 361.]

Appellant's contention, as we understand it, is that the general rule as to the prosecution of an accessory before the fact is not applicable to the case at bar; that the averment that the defendant did "use and employ" the instrument described, upon the body of Lizzie Gleason, could be sustained only by proof that the defendant in person committed the overt act as charged, and that to sustain a conviction upon the theory that the defendant did "advise, cause and procure" the doing of the criminal act as charged, by another, it is essential to set out in the information the name of the person through whose instrumentality the act was committed, in order that the defendant may be sufficiently informed of the accusation and be thus enabled to prepare his defense. The further contention is made by appellant that in negativing the exception of the statute, in case the act was done upon the advice of a licensed physician, it is essential to a valid charge to allege, in accordance with the language of the statute, that the defendant was not a duly licensed physician.

Under the construction of the statute as thus maintained by appellant, if a defendant, who was not a physician, advised, caused and employed a physician

to do the felonious act charged, it would be necessary to allege the name of the physician through whom the act was committed and further that defendant was not a physician and that the act had not been advised by a physician. It also follows from appellant's position that a defendant who was not a physician could not be prosecuted jointly for the offense charged in this case with a physician whom he had employed and procured to commit the forbidden act and for the reason that the charge and evidence to sustain a conviction against each would be essentially different. We cannot agree to this construction of the law. If the offense denounced by the statute under consideration be committed by a defendant not a physician, either directly or by advising the female or another not a physician to commit it, then it would be necessary in such case to allege that the act was not done upon the advice of a duly licensed physician. Section 4459, Revised Statutes 1909, defining the crime of abortion, excepts from the provisions of the section a case in which the act is necessary to preserve the life of the woman or in which the act has been advised by a physician to be necessary for the same purpose. It was held in the case of State v. Fitzporter, 93 Mo. 390, that a physician charged with an offense under that section was entitled to interpose the defense that the act was advised by a physician. But by the terms of the statute upon which the prosecution is lodged in this case that defense is expressly restricted to a person who is not a physician.

The theory of the State in this case was that a physician was the principal in the crime and that the defendant was an accessory before the fact and therefore subject to be charged and tried as a principal. If the prosecution had been against the physician who committed the act it clearly would not have been necessary to charge or prove that he did not act upon the advice of a physician and therefore it was not

necessary to charge or prove such facts against the
defendant who was proceeded against as an accessory
before the fact to a principal who was a physician.
A charge and conviction against an accessory may
be sustained upon facts which would be insufficient if
the accused was proceeded against as principal in fact
for the same offense. [Boggus v. State, 34 Ga. 275;
People v. McKane, 143 N. Y. 455; State v. Comstock, 46
Iowa, 265; People v. Chapman, 62 Mich. 280; 12 Cyc.
189.] We hold that the information is sufficient and
the complaint against it without merit.

II. It is assigned as error that the State failed
to prove the venue of the offense as charged.

There is no direct evidence in the record that
the offense was committed in Lincoln county. How-
ever, while proof of the venue of the crime charged
is necessary to sustain a conviction, direct evidence
of such fact is not required. It is sufficient if it can
be reasonably inferred from the facts and circum-
stances in evidence. [Kelley's Crim. Law and Prac.
132; State v. Pennington, 124 Mo. 388; State v. Shour,
196 Mo. 202; State v. Daugherty, 106 Mo. 182; State
v. McGinnis, 76 Mo. 326.]

It was in evidence that the home of Lizzie Gleason
was in the town of Elsberry, Lincoln county, Missouri;
that Dr. Hemphill resided and had an office in said
town; that Lizzie Gleason went to Dr. Hemphill's
office three times and that the operation which caused
her death was performed the third time, being the
20th day of February, 1908; that on the morning of
February 20, 1908, Lizzie Gleason left her home about
nine o'clock a. m., and returned in about two hours
in a sick and nervous condition; that she immediately
retired to her bed, gradually grew worse and died five
days thereafter. It was also in evidence that the de-
fendant had made her promise to have the abortion
performed, and said to her if she did not get along

well under Hemphill's care she should have the best
physician in St. Louis, and that the defendant told
Hemphill the girl would come to him for treatment.

We are of the opinion that these facts and cir-
cumstances fully authorized the jury to find that the
crime was committed at Dr. Hemphill's office in Lin-
coln county.

III.   It is strongly urged that the court erred in
admitting in evidence the alleged dying declaration
of Lizzie Gleason.

It is shown by the record that before the dying
declaration was offered in evidence the court, in the
absence of the jury, heard the testimony for the State
tending to show the competency of what Lizzie
Gleason had said to her mother as a dying declaration
and also the opposing testimony of the defendant.
Thereupon the court, over the defendant's objection,
held the declaration admissible.   The jury was then
brought in and heard substantially the same evidence
as was given to the court in their absence.

The competency of a dying declaration is a ques-
tion for the court, but all the facts and circumstances
in connection therewith are competent evidence to en-
able the jury to determine the weight and probative
force to which the declaration is entitled.

Because of its controlling importance on the
issues on trial we have carefully read and considered
the evidence bearing upon the admissibility of the
dying declaration.

In support of its competency it was shown by the
State that the declarant had gradually grown worse
from the Thursday morning when she came home
sick until she died.   On Friday evening she was very
sick and had a high, burning fever.   Saturday her con-
dition did not improve and her cheeks began to flush.
She continued growing weaker and on Sunday night
her cheeks were a dark purple.   On Monday morning

about three o'clock her mother went to her room to relieve the other daughter who had been attending her during the night. The mother found the daughter, as she testified, "as bad as she could be to be alive." As soon as they were alone the daughter said to her mother, "Ma, I am going to die and I have something awful to tell you." After confessing her condition and what the defendant and the doctor had done she continued, "Ma, you don't know what it cost me to tell you this, but I couldn't die and meet my God face to face with this awful stain on my soul." She died on the following day.

A number of witnesses testified for the defendant to conflicting statements made by the mother, both out of court and at the inquest, as to what her daughter had told her in the alleged dying declaration. Whether the mother used exactly the same words each time she told it we do not consider of much importance. The wasting fever and suffering of the declarant, the surrounding conditions under which she made the disclosure, her statement of her belief in impending death, and her clearness of mind, indicated by the manner in which she stated to her mother the facts constituting the dying declaration, fully met all the requirements of the law in such cases and leave no doubt in our minds as to the correctness of the ruling of the court in admitting this dying declaration in evidence. [State v. Kelleher, 201 Mo. 614; State v. Craig, 190 Mo. 332; State v. Nocton, 121 Mo. 537.]

IV. Appellant complains of the action of the court in refusing the following instruction asked by the defendant, to-wit:

"If you believe from the evidence that Dr. Hemphill was a duly licensed physician and that Clyde Gow advised Lizzie Gleason to go to him for the purpose of securing such treatment as Dr. Hemphill would advise, and that the operation, if any, was performed

upon her by the advice of Dr. Hemphill and not on the advice of Clyde Gow, then your verdict will be for the defendant, acquitting him, although you may further believe from the evidence that Dr. Hemphill performed upon her a criminal abortion and that her death was caused thereby, and you are further instructed in this connection that Dr. Hemphill was a duly licensed physician at the time of the alleged operation.''

The court did not err in refusing this instruction. The theory of the State was that the defendant was a co-conspirator and accessory before the fact of Dr. Hemphill, and instructions were given to the jury submitting the case upon that theory. There was evidence tending to prove that the defendant advised the deceased to go to Dr. Hemphill without intending that any criminal operation should be performed. This theory of the defense was fully covered by defendant's modified instruction numbered six. And it is well settled that it is not error to refuse an instruction, although it correctly declares the law, if another instruction which is unobjectionable is given upon the same subject. [State v. Sharp, 233 Mo. 269; State v. Nelson, 166 Mo. 191; State v. Franke, 159 Mo. 535; State v. Bradford, 156 Mo. 91.]

V. Appellant complains that the court erred in admitting in evidence against the defendant the acts done and declarations made by Dr. Hemphill after the alleged conspiracy had ended, that is, after the abortion and before the death of Lizzie Gleason. That question has been considered by this court in the recent case of State v. Casto, 231 Mo. 398, and decided against appellant's contention. It has been suggested that the question was not involved in the decision of the Casto case and that what was there said is *obiter* and not binding as a precedent on this court. How-

ever, we consider the doctrine of that case a correct declaration of law as applied to the facts of this case.

VI. It is urged in appellant's brief and was argued at the bar with much earnestness and ability that the evidence is insufficient to sustain the verdict and that the court erred in refusing an instruction directing a verdict of not guilty, as requested by the defendant at the close of the evidence for the State and again at the close of all of the evidence.

It is not necessary to, review the action of the court in refusing such an instruction at the close of the State's case, for the reason that the defendant did not stand upon it, but offered testimony in his defense, and by so doing, as in a civil case, waived his rights under the instruction. [State v. Martin, 230 Mo. 680; State v. Meagher, 49 Mo. App. 571.]

But the instruction in the nature of a demurrer at the close of all of the evidence and the ground of the motion for a new trial that the verdict is against the evidence, call for a brief review of the incriminating facts disclosed by the record and upon which the State relies to uphold the verdict.

Lizzie Gleason made her home with her mother, a widow residing in the town of Elsberry in Lincoln county, this State. She was about twenty-two years of age and unmarried at the time of her death. In the winter of 1907 and 1908 she was teaching a district school in the country about eight miles north of her home and boarded in the same neighborhood, going to her home at the close of each week and returning at the beginning of the next.

The defendant was a minister of the Gospel, unmarried and about thirty-eight years of age when Lizzie Gleason died. His home was also in the town of Elsberry where he was the regular pastor of a church. He was also pastor of a church known as Smith's Chapel located in the neighborhood where

Miss Gleason taught school. In going back and forth between Elsberry and Smith's Chapel, Miss Gleason rode with defendant in his buggy several times, and he was in her company publicly a number of times besides. In the month of January, 1908, Miss Gleason became sick and there were symptoms of pregnancy. In February she left her school and returned to her home in Elsberry. On Thursday morning, February 20, 1908, she left her home and returned after an absence of about two hours in a sick and nervous condition and immediately retired to her bed. She would take no nourishment and soon a high fever developed. Her condition rapidly grew worse and on Sunday night and Monday morning she was suffering greatly and her face had become flushed and purple. At three o'clock Monday morning, while alone with her mother, she called her mother to her bedside and told her that she was going to die and wanted to confess to her what she had done and the cause of her ailment. She then related how the defendant had gotten her in a pregnant condition and caused her to go to Dr. Hemphill where an abortion had been produced upon her on the 20th day of February, 1908. She then said to her mother, "Ma, you don't know what this cost me to tell you, but I couldn't die and meet my God face to face with this awful stain on my soul." She died the next day in the afternoon.

As soon as the death of Lizzie Gleason was known and on the evening of the same day two members of the defendant's congregation went to his home and informed him of the rumor associating his name with the cause of Lizzie Gleason's death. He at once protested his innocence, but admitted he might be brought into the case for the reason that he had taken her to and from school and church several times; that on one of these trips she informed him that she was in trouble and asked his advice; that he thought it was some love affair, but afterwards thought it was

of a different nature and then advised her to go to her mother; she said she could not do that; that he then advised her to go to Dr. Bailey, their family physician; she again said she could not; and so with Dr. Powell; and that he finally advised her to go to Dr. Hemphill. The next night he rode out to the home of Mr. Magee, a member of his church, living in the country near there. The constable placed him under arrest that night on the charge of manslaughter for causing the death of Lizzie Gleason. Before leaving Magee's the next morning in charge of the constable, the defendant asked Magee what he should do, saying at the same time that he was innocent. Magee asked him: "Did you send Lizzie Gleason to Dr. Hemphill to be treated?" He answered, "I did." Magee then asked: "Did you tell Hemphill to treat her?" The defendant answered "I did. I told him to treat her and do what he could for her; that I suspected that something was wrong and that I would be accused." The defendant also told a minister in Elsberry that Lizzie Gleason spoke to him about some throat trouble and asked him about Dr. Hemphill and that he told her that Hemphill was probably as good as any, and further that he told Dr. Hemphill that the girl was coming to him for treatment for her throat.

The morning after Lizzie Gleason had made her statement to her mother, Dr. Hemphill asked her in the presence of Dr. Bailey, the family physician, if she did not promise not to tell anything. Dr. Hemphill on the same day had told the mother that only four of them knew what had been done and that it was her duty to her family to conceal what she had learned.

At the autopsy more than a half gallon of pus was found in the abdominal cavity of the deceased and experts testified that a microscopic examination

of the uterus indicated recent pregnancy and a criminal operation.

Because of the seriousness of the consequences to the defendant and because of the improbability of a person of his professed high·calling being guilty of such an offense, we have considered from every standpoint the facts of this case. That this young girl, when first conscious of her trouble, would go to the man who had brought it upon her is as natural as that a ·child should run to its mother when hurt. If the defendant had been innocent when he learned of this girl's trouble, how improbable it is that he should have suggested to her treatment by a physician and not a word of inquiry as to the guilty party so as to bring about a marriage or punishment for the offense. Without dwelling longer on the evidence and the inferences fairly drawn therefrom, we shall conclude this review with the observation that in our judgment there is no rational explanation of the facts and circumstances in evidence consistent with the defendant's innocence and that the jury was fully warranted in the verdict returned.

Finding no error in the record the judgment is affirmed. *Ferriss, J.,* and *Brown, J.,* concur.